FILED
2019 MAR 1 AM 9:30
CLERK
U.S. DISTRICT COURT

J. Morgan Philpot (Utah Bar No. 11855)
morgan@jmphilpot.com
*Attorney for Defendant, Gabriel Joseph*
JM PHILPOT LAW, PLLC
620 East 100 North
Alpine, UT 84004
(801) 810-8369

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:15-CR-00103-JNP |
| *Plaintiff*, | |
| v. | MOTION TO VACATE JUDGMENT AND SENTENCE |
| GABRIEL JOSEPH, | *Evidentiary Hearing Requested* |
| *Defendant*. | Judge: Jill N. Parish |

Pursuant to 28 U.S.C. § 2255 and DUCrimR 57-9, Defendant Gabriel Joseph ("Joseph") respectfully moves this court for an order vacating the judgment and sentence entered against him in Case No. 2:15-cr-00103-JNP and dismissing the case with prejudice, or for an order granting a new trial.

### INTRODUCTION

On November 3, 2015, following a jury trial Mr. Joseph was convicted on two counts of wire fraud, in violation of 18 U.S.C. § 1343, one count of money laundering, in violation of 18 U.S.C. § 1957, one count of making a false statement to a bank, in violation of 18 U.S.C. § 1014, and one count of willfully failing to file a tax return, in violation of 26 U.S.C. § 7203.

On June 16, 2016, the Court entered its Amended Judgment in a Criminal Case (the "Amended Judgment"),[1] and sentenced Mr. Joseph to 78 months' imprisonment. The Court also entered restitution and forfeiture awards against Mr. Joseph.[2]

Pursuant to the order of this court,[3] Mr. Joseph self-surrendered to federal custody on or about July 11, 2016, began serving his sentence, and has remained in federal custody since that time. On September 1, 2017, the Court of Appeals issued the mandate in its ruling affirming the judgment of this Court.[4]

This Motion is timely under 28 U.S.C. § 2255(f).[5]

## GROUNDS FOR RELIEF

Mr. Joseph is entitled to have the Amended Judgment vacated and the entire matter dismissed with prejudice, or to have the court order a new trial under § 2255(a) and Rule 1(a)(1) of the Rules Governing Section 2254 and 2255; because "the judgment violates the Constitution or laws of the United States." *Id*. Additionally, pursuant to § 2255(a) and Rule 1(a)(4), the "judgement or sentence is otherwise subject to collateral review." *Id*.

Mr. Joseph advances these grounds for relief based specifically on ineffective assistance of his trial counsel amounting to a violation of his Fifth Amended Due Process guarantees, and

---

[1] Docket No. 182.
[2] *Id*. at 9.
[3] *See* Docket No. 193 at 3.
[4] Docket No. 208.
[5] § 2255(f) provides a "1-year period of limitation" in this circumstance, from "the date on which the judgment of conviction" became final. A judgment of conviction that has been appealed unsuccessfully becomes final when "the time for filing a petition for certiorari with the Supreme Court of the United States expires." *Clay v. United States*, 537 U.S. 522, 525 (2003). Mr. Joseph's direct appeal was denied on August 10, 2017, and his 90-day period to file a petition for certiorari with the Supreme Court expired on November 8, 2017.

his Sixth Amendment right to the assistance of counsel.[6] "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have." *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986) (internal quotations omitted).

The United States Supreme Court recently acknowledged that public defenders, like trial counsel in this case, are "overworked and underpaid" and they "serve numerous clients and have only limited resources."[7] Whether based on the nature of his job as a public defender, or otherwise, trial counsel in this case was deficient, and the deficiencies individually and when taken together prejudiced Mr. Joseph defense to the point that his legal representation was constitutionally defective, and this requires vacating the conviction  along with dismissal of the charges or the ordering of a new trial.[8]

The Supreme Court has fashioned a two-pronged test to analyze claims of ineffective assistance of counsel: First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense.[9]

With respect to deficient performance, a defendant need not show total incompetence or that the "overall representation" was lacking; a single error may suffice.[10] The question is

---

[6] *See Massaro v. United States*, 538 U.S. 500, 505 (2003) ("[I]neffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary o determining the adequacy of representation during an entire trial.") *See also Maye v. Pescor*, 162 F.2d 641, 643 (8th Cir. 1947).

[7] *Luis v. United States*, 136 S.Ct. 1083, 1095 (2016).

[8] The terms "trial counsel" or "defense counsel" mean variously, Joseph's court appointed attorneys in this matter including, Clayton Simms, Steven Killpack and/or Richard Mauro.

[9] *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See also United States v. Blackwell*, 12 F.3d 94, 955 (10th Cr. 1997).

[10] *See, e.g.*, *United States v. Cronic*, 466 U.S. 648, 657 n.20 (1984). *See also Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir.2003) (Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others.)

whether the attorney's performance "fell below an objective standard of reasonableness" or "does not mirror the exercise of the skill, judgment, and diligence of a reasonable competent defense attorney."[11] With respect to prejudice, the burden of proof is *less* than a preponderance of the evidence: "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the trial."[12] Rather, the question is whether there is a "reasonable probability that at least one juror would have struck a different balance."[13] Or whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[14] "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome."[15] In this respect, the Court should consider the totality of the circumstances.[16]

## FACTS SUPPORTING EACH GROUND FOR RELIEF

The several errors of trial counsel are addressed in turn. Whether individually or collectively, they show that trial counsel's representation of Mr. Joseph was deficient and constitutionally defective. At the evidentiary hearing[17] requested by this motion, Mr. Joseph will present testimony[18] and detailed exhibits establishing the following facts in support:

---

[11] *United States v. Medlock*, 645 Fed. App'x 810, 815 (10th Cir. 2016).

[12] *Strickland*, 466 U.S. at 693.

[13] *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

[14] *Strickland*, 466 U.S. at 694.

[15] *Id*.

[16] *Id*. at 695.

[17] *See United States v. Palmer,* 902 F. Supp. 2d 1, 10 (D.D.C. 2012) ("Nonetheless, 'unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall…grant a prompt hearing thereon.' § 2255(b). The defendant carries the burden of sustaining his contentions by a preponderance of evidence.")

[18] In addition to Mr. Joseph's prior testimony cited herein, Mr. Joseph is also submitting with this motion (see attached and statement of verification below), a verification of the facts alleged herein, under penalty of perjury.

I.        **Joseph's Counsel Provided Incompetent Legal Advice on Trial Defense.**

In the weeks and days leading up to trial, as evidence at the forthcoming hearing will show, Mr. Joseph fully intended to testify at trial.[19] Additionally, Mr. Joseph repeatedly communicated to his trial counsel that he needed to interview other possible defense witnesses, including Russell C. Skousen (regarding, *inter alia*, reliance on counsel, good faith regarding the structuring of the real estate transaction), Claud R. Koerber (regarding, *inter alia*, evidence related to accuracy and good faith of loan applications, relationship with Founders Capital and promissory notes, good faith related to structure of real estate transactions and equity milling, and reliance on written legal opinions from law firms and attorneys) and Katie Adams (regarding testimony of government witness Brandon Adams, and Mr. Joseph's prior agreements with Mr. Adams for structuring related LLCs, the real estate purchases at issue in this matter, and the

---

[19] Evidence and testimony presented at the evidentiary hearing on this motion will establish that as for as the alleged false income, Mr. Joseph was prepared to testify and provide supportive documents that show he asked loan officer about that and was advised to provide gross income of his business and related bank statements, which is what he did. He also provided his Founders Capital promissory note and explained the relationships involved. Mr. Joseph was further prepared to testify and provide evidence that the lending institution saw all income and expense over 3 months (or more) and used that accurate information to issue the loan. Mr. Joseph was also prepared to testify and establish that he never stated to the realtor he was going to use the property as business retreat, but that he had work remotely from the property and would use it as second home initially and eventually move and live there full time. Joseph was informed that based upon these characteristics the loan qualified "Primary Residence/Owner Occupied" by the lender. Joseph believed he was making true and complete statements. Finally, regarding the value and appraisal: Joseph was prepared to testify and provide evidence that he had been buying/selling homes since 2003/2004. He was initially trained how to evaluate valve using "for sale" and "sold" data.  On every transaction, he compared/evaluated using both.  He did so on 100-200 property evaluations and submitted offers dozens, entered contracts on more than a dozen, and completed several other real estate transactions relying in good faith on this same approach. On Red Hawk, he did the same. He never spoke to the appraiser, except to pay him for the appraisal to complete the loan. This would have added essential context the appraiser's testimony. Thus, Joseph was prejudiced when his trial counsel rejected this strategy, counseled him not to testify, in favor of an incompetent defense, and without investigating Joseph's preferred approach.

commitment to seeking, obtaining and following legal advice at each step) and other possible witnesses, to enable Joseph to put on a full defense, including a factual innocence defense related to his truthful and good faith statements of income, assets, etc.

However, in the final days before trial, and again during trial itself, Mr. Joseph's legal counsel pushed back and advised him that he did not need to testify, and did not need these witnesses, because his legal counsel had devised a different trial strategy. Mr. Joseph reluctantly relied upon this advice, based upon his trial counsel's purported strategy, and assurance that the strategy was legally sound. But trial counsel's strategy was legally untenable and incompetent and essentially amounted no defense at all.

Trial counsel's strategy was essentially two-fold: (1) blame the bank and (2) blame Shannon Spangler. Unbeknownst to Mr. Joseph, both defenses were obviously legally deficient from the outset, and yet trial counsel pursued these "defenses" in lieu of adequately investigating and presenting actual legitimate defenses and evidence that Mr. Joseph had discussed and preferred in repeated conversations with each of his attorneys.

A. <u>Bank Negligence or Lending Practices Do Not Negate Intent and Are Irrelevant to the Merits of a Legitimate Trial Defense for Joseph.</u>

With respect to blaming the bank, trial counsel admitted into evidence portions of the April 13, 2011 Senate report: *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*. As trial counsel argued to the jury, "you ought to consider this report and compare what [Ms. Sanudo] said to what the United States Senate concluded about the way that this bank conducted their underwriting practices and policies."[20] But as the government was able to point out, "[t]he Senate Report doesn't have anything to do with this loan… They are talking about

---

[20] Trial Tr. at 831:8-11.

general practices of WAMU."[21] Indeed, there was no evidence elicited by trial counsel that the questionable and perhaps fraudulent lending practices described in the Senate Report were in any way implicated in this case.

Perhaps more importantly, courts have routinely held that "[a] bank's negligence or lack of diligence in uncovering the fraud is not a defense".[22] Indeed, defendants "cannot point to loose lending practices of the victim financial institutions to establish a defense to the charges of wire fraud or conspiracy to commit wire fraud and bank fraud."[23] As the Tenth Circuit has recognized, "[t]he focus of the language defining a scheme to defraud is on the violator, not the victim."[24] And contrary to trial counsel's argument that "[e]verybody at the time was trying to live the million dollar lifestyle because they were allowed to do it because the system allowed for it[,]"[25] courts are clear: "any evidence about the general practices of the mortgage industry, in effect that 'everyone was doing it,' while knowing that the information was false, does not tend to establish a good faith defense, does not negate [the defendant]'s intent to defraud, and is thus irrelevant."[26] Simply stated, even if the Senate Report concluded that Washington Mutual engaged at times in questionable and perhaps fraudulent lending practices, and even if "everyone was doing it," blaming the bank was never a viable defense, much less one of only two defenses that trial counsel would pursue at trial.

---

[21] Trial Tr. at 853:17-23.

[22] *United States v. Peterson*, 823 F.3d 1113, 1123 (7th Cir. 2016).

[23] *United States v. Maximov*, Case No. CR10-822, 2011 WL 4915162, at *2 (D. Ariz. Oct. 17, 2011) (unpublished).

[24] *United States v. Drake*, 932 F.2d 861, 864 (10th Cir. 1991).

[25] Trial Tr. at 834:1-3.

[26] *United States v. Rodriguez*, Case No. 2:11-0296, 2016 WL 5847008, at *1 (E.D. Cal. Oct. 5, 2016) (unpublished).

Trial counsel's reliance on a legally invalid and plainly deficient defense shows how trial counsel's representation of Mr. Joseph was likewise constitutionally deficient.

      B.   <u>The "Shannon Spangler Defense" Was Never Proven and Easily Dispelled.</u>

Trial counsel staked Mr. Joseph's entire defense on proving that Shannon Spangler had committed fraud. However, trial counsel did not interview Ms. Spangler, subpoena documents from Ms. Spangler and was wholly unprepared to cross-examine Ms. Spangler at trial. Indeed, against what Mr. Joseph had been preparing for and expecting leading up to trial, his trial counsel conceded in opening statements that a fraud was committed: "I would contend to you that there was fraud in this case, but it wasn't fraud committed by Gabriel Joseph."[27] Trial counsel's entire theory from the beginning was essentially: "Shannon Spangler did it." But trial counsel did next to nothing to elicit evidence or otherwise prove that Shannon Spangler acted fraudulently with respect to Mr. Joseph's loan.  In fact, in the lead up to trial almost no investigation was done to evaluate this kind of strategy, by interviewing key government witnesses (they were not interviewed by defense counsel) or by comparing this approach to the merits of a straight forward innocence defense that no fraud was committed – relying on witnesses and evidence Joseph had previously identified and that Joseph had requested each of his attorneys interview (including e.g., multiple requests that his trial counsel interview and seek documents from Joseph's former business associate Mr. Koerber – but no interview was conducted, and no documents sought or obtained).

Instead, Mr. Joseph's case-in-chief at trial was presented through only three (3) witnesses: Cara Milgate, Paul Rademaker, and Glenn Traylor. Prior to Mr. Joseph's case-in-chief, trial counsel argued that he should be able to admit evidence of Ms. Spangler's prior

---

[27] *Id*. at 30:14-16.

unethical and otherwise fraudulent behavior. But the Court instructed trial counsel that before such evidence could be admitted, there had to be some "kind of link to this loan file that you can make."[28] In response, trial counsel assured the Court (like he had assured Mr. Joseph) that "we can make a link. We can make a link."[29] But trial counsel never even attempted to make the "link;" trial counsel never attempted to introduce evidence of Ms. Spangler's prior unethical and/or fraudulent conduct. Rather, the three witnesses established only that Ms. Spangler was an employee of Marblestone Funding and that her telephone number appeared on the loan application at issue. Indeed, Cara Milgate merely testified that Shannon Spangler was an employed by Marblestone Funding as "a loan officer, a loan consultant."[30] Paul Rademaker only testified that Shannon Spangler "was the person representing Marbleston."[31] And Glenn Traylor only testified that he has since learned that a telephone number on the underlying loan application is "for a person called Shannon Spangler."[32] Incredibly, none of these witnesses had any knowledge whatsoever about the loan transaction for which Mr. Joseph was charged and ultimately convicted. So, Mr. Joseph's case-in-chief was essentially to confirm where Shannon Spangler worked and what here telephone number was. This  was not merely bad strategy, it was legally insufficient performance, because no reasonable attorney could pursue this direction in good faith,  especially in  light of the lack of pretrial interviews, lack of pretrial subpoenas, and only making this significant change in defense strategy right before trial started.

Perhaps more importantly, trial counsel's exclusive reliance on the Shannon Spangler defense was easily dispelled by the fact that, as the government argued to the jury, Mr. Joseph

---

[28] Trial Tr. at 744:14-16.
[29] Trial Tr. at 744:17-18.
[30] Trial Tr. at 752:13-17.
[31] Trial Tr. at 759:21-22.
[32] Trial Tr. at 768:12-15.

"appear[ed] at the closing and sign[ed] the documents."[33] In other words, even if Ms. Spangler filled out the loan application, Mr. Joseph later attested to its accuracy. So, as with blaming the bank, blaming Shannon Spangler was a non-starter. Competent defense counsel would clearly see this, and investigate and pursue other possible defense strategies.

Evidence at the hearing on this motion will establish that but for Mr. Joseph's legal counsel's last-minute change of direction, the defense he put forward at trial would have been significantly different and would have included a competent legally tenable strategy – based upon what Mr. Joseph had communicated with all of his attorneys pretrial.

Mr. Joseph will testify that he met with his trial counsel on the day before trial began. His counsel explained a change in direction  (because trial counsel was not prepared for anything else) that Joseph should not testify because they would be pursuing the new, simpler strategy about Shannon Spangler. However, by focusing on this new strategy, Mr. Joseph's trial counsel failed to consider or use witnesses such as Katie Adams (the wife of one of the government's key witnesses).  Mr. Joseph will also testify (and Mrs. Adam's will also testify in support) his legal counsel was unexplainably dismissive of Mrs. Adams from the beginning. He would never give Mr. Joseph a firm answer as to having her fly in from Oregon to testify or not, but Mr. Joseph told her to come to trial anyway, and to be ready to testify.  Mr. Joseph told his trial counsel that Mrs. Adams was coming into town, even during Mr. Adam's testimony (Brandon Adams) Joseph told his attorney that Mrs. Adams was out of the courtroom, in the lobby.  Mr. Joseph had explained how Ms. Adams could offer essential testimony to impeach and clarify Mr. Adams testimony, and urged his legal counsel to call her to testify about 1) Mr. Adam's drug use being the reason he couldn't remember any detail about the transactions at issue and 2) Mr. Adams and

---

[33] Trial Tr. at 858:2-4.

Mr. Joseph's original conversations about how to structure the subject real estate transaction as partners (he owned SCIPC, LLC which sold the cabin to Joseph), and specific conversations about ensuring the transaction was legal. Mr. Joseph and Mrs. Adams will testify that the limits discussed and required by Mr. Joseph and agreed to by Mr. Adams included that they would walk away from any transaction that was not legal and that the rule was "we don't need the money and don't want to break the law." Mrs. Adams was a party to those conversations and could explain why Mr. Adams couldn't recall or remember facts related to the conversations or answer question's accurately at trial, due to his intervening extensive drug use – which caused severe memory loss. Mrs. Adams alluded to all of this at Mr. Joseph's sentencing hearing.

Mr. Adam's testimony was central to the government's theory that Joseph was the master mind pulling puppet strings. However, defense counsel did not significantly investigate Mrs. Adams possible testimony, and told Mr. Joseph during trial, without explanation, that he was not calling her as a witness and was instead sticking with the Shannon Spangler defense.

An incompetent and last-minute defense strategy decided upon and communicated to Mr. Joseph for the first time - *the day before trial*, and after failing to prepare, investigate and plan based upon key facts and key witnesses, repeatedly described and urged by Mr. Joseph, is constitutionally deficient. *See McQueen v. Swenson*, 498 F.2d 207, 216–17 (8th Cir. 1974) ("The most able and competent lawyer in the world cannot render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense.")  There is no valid or permissible strategy by appointed defense counsel, in making a last minute defense change of course, after failing to prepare and failing to take reasonable measures to be prepared to meet the elements of the crimes charged or some other tenable theory of defense.

The fact that Mr. Joseph relied upon his trial counsel's incompetent defense, and reluctantly agreed not to testify on his own behalf, based upon incompetent legal advice, accompanying trial counsel's failure call defense fact witnesses  - and instead called witnesses who were not interviewed in advance by counsel and clearly could rebut key elements of the charged offenses, when Mr. Joseph had informed counsel that such witnesses existed (as described herein) is sufficient prejudice to justify a new trial.

II.    **Joseph's Counsel Failed in His Duty to Investigate and Present Other Meritorious Defenses, and Essential Elements of Mr. Joseph's Defense.**

    A.   <u>Trial Counsel Failed to Investigate or Present Mr. Joseph's Defense of Good-Faith Reliance on the Advice of Legal Counsel.</u>

Both before and after the underlying real estate and loan transactions for which Mr. Joseph was convicted, he sought and obtained advice of counsel and was specifically advised that the general structure of the transactions, as well as the specific real estate transaction itself, was not illegal. Mr. Joseph made this known to trial counsel, who refused to investigate the defense or present it at trial. Billing records obtained from the law firm, Ray Quinney & Nebeker, when presented at an evidentiary hearing on this motion will establish that Mr. Joseph specifically sought and obtained legal advice and analysis regarding, *inter alia*, the loan structure and loan issues regarding" in April 2007. While some of those interactions with counsel would have occurred after the February 21 and 23, 2007 dates of the wire transfers identified in the Superseding Indictment, the alleged scheme and artifice to defraud spanned the time period from "late 2006 through August 2007."[34]

Additionally, testimony from Mr. Joseph, attorneys Douglas Matsumori, Russell C. Skousen and Mr. Joseph's business partners  (including Lindsey Dayton, Steve Freestone, Claud

---

[34] Docket No. 108 at 2 ¶ 6.

R. Koerber, Clavell Anderson, and Sonny Jensen) will establish that Mr. Joseph also sought and received legal advice on how to structure the real estate transaction at issue, and that the advice he and several of his business associates received was that the structure and manner and method he used in carrying out the transactions at issue here, were legitimate and legal.

Good-faith reliance on counsel is a defense to Mr. Joseph's counts of conviction.[35] In order to establish the defense, a defendant must show "(1) a request for advice of counsel on the legality of a proposed action, (2) full disclosure of the relevant facts to counsel, (3) receipt of advice of counsel that the action to be taken will be legal, and (4) reliance in good faith on counsel's advice."[36] Mr. Joseph could have satisfied the foregoing elements with respect to the loan transaction for which he was charged. Specifically, Mr. Joseph and his associates sought legal advice from Russell Skousen and attorneys at Ray Quinney & Nebeker, including attorney Douglas Matsumori (from whom Joseph received a written opinion letter on the transaction at issue), on the legality of equity milling (the technique and contract form Mr. Joseph used to structure the real estate transaction at issue), the legality of the general structure of loan transactions like the one for which Mr. Joseph was convicted, and even the legality of the specific loan transaction for which Mr. Joseph was convicted. Mr. Joseph and his associates disclosed all relevant and material facts to their attorneys. Mr. Joseph and his associates were

---

[35] *See United States v. DeFries*, 129 F.3d 1293, 1308 (D.C. Cir. 1997) ("good faith reliance upon advice of counsel establishes a defense to specific intent crimes") (internal quotations and citation omitted); *United States v. Okun*, Case 3:08-cr-132, 2009 WL 414009, at *6 (E.D. Va. Feb. 18, 2009) (unpublished) ("good faith reliance on the advice of counsel is a defense to specific intent crimes such as mail and wire fraud because such reliance tends to negate the required *mens rea*") (citation omitted); *United States v. Scott*, 37 F.3d 1564, 1583 (10th Cir. 1994) (acknowledging that reliance on the advice of counsel can "negate willfulness"); *United States v. Hill*, 643 F.3d 807, 850-51 (11th Cir. 2011) (discussing reliance on advice of counsel defense with respect to a mortgage fraud and money laundering scheme).
[36] *United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005).

advised that the transactions they were undertaking were legal. And Mr. Joseph relied on this advice in executing the loan transaction for which he was ultimately convicted.

Importantly, Mr. Joseph disclosed this information to trial counsel, but trial counsel not only failed to present the defense at trial, he failed to investigate it – never contacting attorneys Doug Matsumori or Russell C. Skousen.

The Tenth Circuit has recognized how attorneys have an "obligation to investigate particular defenses or seek out mitigation evidence."[37] And "an attorney's failure to present a defense theory or mitigation evidence cannot be considered strategic where that decision was influenced by inadequate preparation and investigation."[38] Simply stated, "the question is not whether counsel did something; counsel must conduct a full investigation and pursue reasonable leads when they become evident."[39] Here, there is no rational or reasonable explanation for trial counsel's failure to investigate Mr. Joseph's good faith reliance on counsel defense. And trial counsel's failure was certainly prejudicial.

For example, in closing argument, the government referred to the testimony of the Washington Mutual underwriter, Cecilia Sanudo, and argued as follows: "If [Mr. Joseph] already owned the property – Ms. Sanudo testified if he already owned the property, there was no need for the loan" and "the essence of the scheme was that he sold the property to himself."[40] Stated differently: "why would anybody buy a property from themselves, that they already owned, for double the price."[41] Rather than attempt to explain why Mr. Joseph procured the loan in the first place, trial counsel attempted, quite unsuccessfully, to blame the bank or Shannon Spangler. But

---

[37] *Bullock v. Carter*, 297 F.3d 1036, 1049 n.7 (10th Cir. 2002) (citations omitted).
[38] *Id*. (citations omitted).
[39] *Wilson v. Sirmons*, 536 F.3d 1064, 1085 (10th Cir. 2008).
[40] Trial Tr. at 779:1-5.
[41] Trial Tr. at 809:19-21.

contrary to the government's assertion, that the only "answer" was "to defraud the bank,"[42] there was a simple and straightforward explanation: reliance on the advice of counsel. The underlying loan transaction was patterned after the equity milling model employed by Mr. Joseph and his associates in the relevant time period. Mr. Joseph had sought and received advice of counsel that the equity milling model was legal, and he even sought and received advice of counsel that the specific loan transaction for which he was convicted was legal. So, while Ms. Sanudo may not have seen a reason for Mr. Joseph to engage in the underlying loan transaction, there was a perfectly legitimate explanation, one which trial counsel failed to even investigate.

In sum, even if trial counsel did "something," that is not enough; he was required to "conduct a full investigation and pursue reasonable leads when they [became] evident."[43] As a result of trial counsel's failure to even investigate Mr. Joseph's reliance on advice of counsel, Mr. Joseph lost perhaps his strongest defense to the charges against him. As courts have recognized under similar circumstances: "[w]hen a defense counsel fails to investigate his client's only possible defense, although requested to do so by him; and fails to subpoena witnesses in support of the defense, it can hardly be said that the defendant has had the effective assistance of counsel."[44] The result here is no different. Although requested by Mr. Joseph, trial counsel failed to investigate what could have been a complete defense to liability, even assuming the allegations of the Indictment were proved at trial. Mr. Joseph did not receive effective assistance of counsel.

---

[42] Trial Tr. at 809:21-22.
[43] *Wilson*, 536 F.3d at 1085.
[44] *Gomez v. Beto*, 462 F.2d 596, 597 (5th Cir. 1972) (citations omitted).

B.  <u>Trial Counsel Failed to Investigate or Present Other Legitimate Defenses at Trial</u>.

In addition to trial counsel's failure to investigate and present a good faith reliance on the advice of counsel defense, explained above, trial counsel failed to investigate, or present other actual legitimate defenses and witnesses urged repeatedly by Mr. Joseph including but not limited to David Ingles (testimony -  as trial counsel knew, having been told by Joseph multiple times, will confirm that Mr. Joseph never communicated with the appraiser about value of the property, the loan amounts, etc., also will confirm that Joseph acted in good faith regarding disclosures as to owner-occupied versus non-owner occupied status of loan application); Shannon Spangler (trial counsel never interviewed or attempted to interview Shannon Spangler); Rick Koerber (no interview); Katie Adams; Joseph Thibodeau (no interview) (tax attorney whose testimony – as trial counsel knew, having been told by Joseph multiple times, will confirm Joseph's good faith in not filing a return, in attempting  to secure accurate returns, and advice given to Gabe not to pay the IRS until his work was completed), Russell Skousen and/or Doug Matsumori. First, trial counsel failed to investigate there was available and credible evidence that Mr. Joseph never actually made a false statement or material omission to the bank. Testimony at the evidentiary hearing on this motion will establish, by Mr. Joseph, that his income and asset declarations were supportable by objective evidence (Joseph, Skousen, Koerber, Matsumori), and that the setting up of a separate company was done in good faith and in a manner that was legal and disclosed where required (Joseph, Adams, Koerber, Motsumori).

Trial counsel failed to adequately investigate and present potential valid defenses, including (1) that there was no scheme to defraud because Mr. Joseph's conduct was in good faith and consistent with "equity milling," a process that legal counsel had determined was not illegal, and (2) that no false statements were made because Mr. Joseph's income, assets, and

owner occupancy status were all made in good faith and were accurate and/or in accordance with discussions he had with loan officers and other essential individuals.

      C.  <u>Trial Counsel Failed to Investigate or Present Expert Accounting Testimony</u>.

      Mr. Joseph's trial counsel failed to investigate and retain one or more expert witnesses. The jury was instructed that it could convict Mr. Joseph of making a false statement to a bank if at least one of five potential false statements or omissions was proven.[45] Trial counsel failed to investigate expert testimony and did not retain an expert witness or call an expert witness. Had he done so, he could have presented one or more experts at trial who would have opined that the alleged false statements and omissions were either (1) not false/misleading, or (2) were immaterial. The issues presented by the government, to establish false statements by Mr. Joseph related to income, assets and cash-flow transactions, as well as intra-company accounting, cash transfers and payments of fees are professional accounting related questions that require at least pre-trial investigation to form competent trial strategy, and in this case, defense trial testimony to rebut financial evidence relying largely on discretionary characterizations by Mr. Joseph and federal financial institutions, as well as business related financial judgements. Thus, while trial counsel is presumed to have the latitude to make imperfect or even mistaken strategic decisions on what witnesses to call and what strategies to pursue, by failing to hire an expert and even investigate financial defenses, trial counsel's performance here was constitutionally deficient. *See e.g. Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary… An attorney's ignorance of a point of law that is fundamental to his case

---

[45] *See* Docket No. 116-1 at 63.

combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.")

Here, trial counsel's failure to investigate, also resulted in specific prejudicial to Mr. Joseph at trial. For example, trial counsel failed to present evidence that Mr. Joseph made substantial payments on the underlying loan for approximately one and a half years. This relates directly to a defense on the element of intent. Further, the government argued at closing that Mr. Joseph had no "skin in the game" and that it was his plan to default on the loan and walk away with $2 million from the beginning. But trial counsel did not investigate or present evidence of the fact that Mr. Joseph did have "skin in the game," having made payments for approximately one and a half years, in the amount of $225,000 and had no expert accounting opinion related to the value of those payments, the regular pattern of those payments, and the effect these have on evaluating with a loan and lender relationship is professionally viewed as legitimate. Finally, trial counsel's failure to financial investigate the underlying merits of the charges was directly prejudicial to Mr. Joseph's defense on the specifics of the financial transactions alleged by the government at trial. For example, when the initial transfer of funds was made from SCIPC, LLC to Annuit Coeptis on February 26, 2007, bank records show that Annuit Coeptis had a balance of $130,086.32. Then, while the funds were in Annuit Coeptis's account, a deposit was made in the amount of $200,000. When funds were transferred back to Annuit Coeptis, there was a balance of $382,917.20. And finally, when Annuit Coeptis eventually transferred $2.1 million to Founders Capital on March 13, 2007, there was a remaining balance of $1,002,714.36. On these facts the government's witness, IRS Agent Marker essentially testified that every time there was a transfer on his summary chart, it was comprised entirely of the proceeds of the Red Hawk Transaction. Indeed, he repeatedly testified that transfers could not have been made without the

proceeds from the Red Hawk Transaction. But bank records that will be presented at the hearing on this motion will show that with each transfer, the initial Red Hawk Transaction proceeds were commingled more and more with funds from other sources. Indeed, in the months of February and March, when the transfers occurred, Annuit Coeptis had total deposits in the amounts of $5,198,756.04 and $5,798,999.66, respectively. It was also undisputed at trial that the "gross receipts" were deposited with SCIPC, LLC and then transferred to Annuit Coeptis, and that Agent Marker's testimony ended with a transfer of funds from Annuit Coeptis to Founders Capital. And even though funds were transferred to Mr. Joseph's personal accounts at Utah Community Credit Union and Zion's Bank, those funds were either immediately transferred back to Annuit Coeptis, or the government failed to show how the funds benefitted Mr. Joseph individually, such as reaching Mr. Joseph as salary or reimbursement. Rather, the bank records tend to show that the gross receipts were commingled with significant amounts of money from other sources and ultimately used for the benefit of Annuit Coeptis and to satisfy corporate obligations. In fact, in the months of February and March, when all of the transfers covered by Agent Marker's testimony occurred, Annuit Coeptis had total deposits in the amounts of $5,198,756.04 and $5,798,999.66, and total withdrawals in the amounts of $4,468,149.89 and $7,192,102.89. The point is, that without a financial expert, pre-trial (to assist in making strategic decisions) and for testimony at trial, the failure was not merely strategic – it was constitutionally defective and prejudicial.[46]

D.  <u>Trial Counsel Failed to Investigate or Defended Tax Charges</u>.

Trial counsel failed to adequately investigate or present any evidence whatsoever related to the tax count for which Mr. Joseph was convicted. Trial counsel did not address the tax count

---

[46] *See e.g. Kimmelman*, 477 U.S. at 385.

in opening statements or present any evidence related to the tax count in Mr. Joseph's case-in-chief. This failure to investigate, included a failure to call Joseph's prior tax attorneys, and the hearing on this motion will show that Joseph's failure to file and pay was an  advised action, because he was concerned he could not on  his own accurately determine his taxes, and has been advised to wait, even if it was seriously late,  until professional completed accurate returns. Further, evidence will show that if trial counsel had investigated, as requested multiple times by Joseph, evidence could have been presented to the jury that a) Joseph was attempting to pay his taxes, and had hired a company to prepare accurate returns, b)  the company was paid but did not finish the job, and ultimately Joseph was exhausted of resources to receive other professional help to complete the task.

Mr. Joseph's legal counsel had been informed by him and was actually aware that Joseph also paid a $75,000 retainer to a tax attorney to try and work with the IRS in rectifying the situation, and that tax attorney advised Joseph: "don't do anything. Don't file. Don't contact the IRS. I'll handle everything."  Years later, when Joseph was charged with willful failure to file, this same attorney demanded an additional $100,000 before he would provide Joseph with complete returns and later withdrew from his representation when Joseph couldn't pay. Trial counsel failed to investigate this matter, failed to interview or subpoena documents from the tax attorney or tax company involved, and failed to present any of this evidence to the jury.  This was therefore not an informed or strategic decision by Joseph or his attorney, but constitutionally deficient and prejudicial legal counsel that on the face of the matter clearly contributed to Joseph's convictions on these charges, where readily available evidence could very reasonably have changed the jury's decision and trial outcome.

**III.     Trial Counsel Failed to Object to the Admissibility of Government Witness Jay Garlick's Testimony, Failed to Object to AUSA Strain's Patently False Statements at Closing Regarding Garlick's Testimony, and Refused Multiple Invitations to Present a Limiting Jury Instruction.**

> **A.   Trial Counsel Failed to Object to Hypothetical, Irrelevant and Prejudicial Testimony of Jay Garlick.**

One of the government's key witnesses to testify regarding Mr. Joseph's alleged wire fraud scheme, and Mr. Joseph's intent to commit fraud was Jay Garlick. During his direct examination, Garlick testified about a conversation in which Mr. Joseph allegedly described a loan transaction that actually never occurred. Trial counsel did not adequately object to the admissibility of Mr. Garlick's testimony. One reason is that trial counsel had not interviewed Mr. Garlick or otherwise investigated his anticipated testimony.

Mr. Joseph never entered a single real estate transaction, or conducted any other business with him, but this fact was never presented to the jury on cross-examination or in Mr. Joseph's case-in-chief. Mr. Garlick was allowed to testify regarding statements on loan applications that never existed, and Mr. Garlick never submitted a single loan application for Joseph or his wife. Yet Garlick testified, without objection from Mr. Joseph's trial counsel, regarding hypothetical transactions that Garlick guessed might happen.

> **B.   Trial Counsel Failed to Object to Egregious and Prejudicial Misstatements Regarding Jay Garlick's Testimony.**

In *Zapata v. Vasquez*, the Ninth Circuit explained that "absent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct."[47] Notwithstanding, the *Zapata* court found ineffective assistance for failing to object to "egregious misstatements" that were "fabricated from whole

---

[47] 788 F.3d 1106, 1115 (9th Cir. 2015).

cloth".[48] Admittedly, unlike in *Zapata*, this was not a murder trial and the prosecutor did not use inflammatory racial slurs in closing argument. Nonetheless, the Government made statements about Mr. Garlick's testimony that were patently false and "fabricated from whole cloth." In the context of a fraud trial, the Government's misstatements were egregious, and trial counsel's failure to object was constitutionally deficient.

In Mr. Joseph's case, during closing arguments, the government falsely argued that in his conversation with Mr. Garlick, Mr. Joseph had "admitted" to having his wife lie about her income on a large loan application. Not only did Mr. Joseph's trial counsel fail to object or raise any issue with government's blatant mischaracterization of the evidence – Garlick had no personal knowledge of any loan transaction.   Specifically, the government made the following statement to the jury: "You heard, interestingly, from Mr. Jay Garlick. Mr. Garlick told you about a conversation that he had with Gabriel Joseph in 2004. In that conversation *Gabriel Joseph admitted that he had his wife lie about her income on a large loan application when she was pregnant and working outside of the home*."[49]

This statement by the Government was absolutely false; there was no evidence, much less a reasonable inference, that Mr. Joseph "admitted that he had his wife lie about her income on a large loan application". Mr. Garlick merely recounted a conversation with Mr. Joseph where, in order to explain the equity milling program, Mr. Joseph used his wife as an example of "how that *would* work,"[50] and that "using her credit score, he *could* get a stated income loan…"[51] In other words, this supposed loan application was hypothetical only. As Mr. Garlick testified, "it was

---

[48] *Id*.
[49] Trial Tr. 798:4-12 (emphasis added).
[50] Trial Tr. at 189:2-6 (emphasis added).
[51] Trial Tr. at 189:8-10 (emphasis added).

needed to understand the program, to have an example." Indeed, on cross-examination Mr. Garlick admitted that he never saw a loan application and he did not "know if a loan application went to somebody".[52] And the Government never produced the supposed loan application or offered any evidence that it ever existed. This is because the loan application did not exist, a fact of which the Government was undoubtedly aware. Yet, prosecutors represented to the jury, in a case where Mr. Joseph was being prosecuted for lying on a loan application, that Mr. Joseph had admitted to lying on loan applications before. This was an "egregious misstatement" of the evidence "fabricated from whole cloth."[53] Trial counsel's failure to object was constitutionally deficient.

C.   Trial Counsel Failed to Request a Limiting Instruction Regarding Government Witness, Jay Garlick's Testimony.

After Mr. Garlick testified, the Court invited trial counsel on at least three (3) different occasions to submit a limiting jury instruction. Trial counsel never did. This failure allowed Mr. Garlick's testimony to impermissibly influence the jury to Mr. Joseph's prejudice.   The trial transcript reveals that Garlick was a key witness to establish the government's allegation of a scheme to defraud, and Mr.  Joseph's intent regarding how he structured loan transactions. A limiting instruction would more than reasonably have changed the outcome of trial.

IV.      **Trial Counsel Failed to Request A *Duty To Disclose* Jury Instruction.**

Ineffective assistance of counsel has been found where "defense counsel's conduct with respect to the jury instructions was unreasonable and far below prevailing professional standards."[54] Further, in failing to request and/or present jury instructions, "merely labeling such a choice 'trial strategy' does not automatically immunize an attorney's performance from sixth

---

[52] Trial Tr. at 191:20-192:15.
[53] *Zapata*, 788 F.3d at 1115.
[54] *United States v. Span*, 75 F.3d 1383, 1387 (9th Cir. 1996).

amendment challenges."[55] "Counsel's performance is constitutionally deficient if 'counsel's errors with the jury instructions were not a strategic decision to forego one defense in favor of another' but 'the result of a misunderstanding of the law.'"[56] Here, trial counsel manifested a "bungled handling of the jury instructions," not based on some strategic choice, but based on deficient performance and misunderstandings of the law.[57]

The gravamen of the Government's case was that Mr. Joseph committed fraud by omission; namely that he failed to disclose how income, assets, or bank accounts were encumbered or that SCIPC was not an arm's-length entity, or that the Park City property had been purchased for less than it was being sold. But "a nondisclosure can support a wire fraud charge only when there exists an independent duty that has been breached by the person so charged."[58] As one court has explained, "[i]n the civil context, a fraud claim is permitted only if it arises from acts that are separate and distinct from the contract…If the same rule did not apply in the criminal context, every breach of a bank loan agreement could give rise to criminal fraud prosecution."[59] Thus, in *Steffen*, the Eighth Circuit affirmed the dismissal of an indictment where "the Government does not argue that Steffen was bound by a fiduciary or statutory duty to disclose" and "the alleged omissions are indistinguishable from breaches of Steffen's contractual duties under the security agreement."[60]

Here, there was no evidence, and the Government never argued, that Mr. Joseph was bound by some fiduciary or statutory duty to disclose that funds in his Founders Capital account

---

[55] *Debarge v. Stewart*, 39 F. App'x 577, 578 (9th Cir. 2002).
[56] *Id*. (citations omitted).
[57] *Span*, 75 F.3d at 1387.
[58] *United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016) (citing authorities).
[59] *United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012) (internal quotations and citations omitted).
[60] *Id*.

or Utah Community Credit Union account were "in part obligated to investors," or that SCIPC had recently purchased the property for "less than half of what Joseph was now claiming the property was worth."[61] Mr. Joseph was clearly entitled to a "duty to disclose" instruction, and trial counsel's failure to even request such an instruction was constitutionally deficient. Simply stated, "counsel's failure to request the appropriate instructions was not a strategic choice, but the result of his failure to understand the applicable law."[62]

## V.     Trial Counsel Failed to Competently Advocate For Joseph's Speedy Trial Rights under the Speedy Trial Act.

Charges against Joseph were initially dismissed on November 13, 2014 based upon violations of the Speedy Trial Act.  Mr. Joseph had filed a motion to dismiss alleging that 293 days elapsed unexcluded on the Speedy Trial Act 70-day clock, and another 300 days had been excluded based upon faulty ends-of-justice orders.  *See* Case 2:12-cr-00072-RJS, Docket No. 88 at p. 16 and p. 19. The government conceded the Speedy Trial Act violation, did not dispute the number of days overrun or the faulty ends-of-justice orders, but argued that dismissal should be without prejudice because most of the continues involved were at Mr. Joseph's request. *See id.*, at Docket 89.  District Court Judge Robert Shelby entered an order dismissing the charges "without prejudice" but did not enter a memorandum order with findings or conclusions.  *See* Case 2:12-cr-00072-RJS, Docket No. 93.

Mr. Joseph's counsel did not file a reply brief addressing the weighing of Speedy Trial Act factors or addressing culpability for Speedy Trial Act delay (meaning delay that caused the violation as opposed to mere calendar delay) and did not address prosecutor or court factored neglect of the Speedy Trial Act clock, any pattern of neglect, or the impact of reprosecution

---

[61] Docket No. 116-1 at 63.
[62] *Debarge*, 39 F. App'x at 578.

factors. In arguing prejudice, Mr. Joseph's trial counsel only scantily addressed the issue of prejudice beyond the obvious docket history of the case, and a general attack on discovery and availability of discovery or defense information and did not investigate actual prejudice (e.g. related to the need to interview the witnesses described above, to subpoena documents from these witnesses, etc.,). Mr. Joseph's trial counsel did not argue – in the seriousness of the offense factor – that the tax charges were misdemeanors. On appeal, the Tenth Circuit acknowledged that this was a legitimate argument but concluded that it had been waived by trial counsel: "Now, for the first time on appeal, [Mr. Joseph] argues that the misdemeanor offenses were not serious. While the argument before us is better than the one before the district court, it comes too late."[63] Worse, after re-indictment, Mr. Joseph's counsel never investigated an additional Speedy Trial Act violation. This is significant because upon re-indictment, a new 70-day Speedy Trial Clock started on February 25, 2015. See 18 U.S.C. 3161(d)(1). But, no speedy trial order was entered excluding any time and on April 6, 2015 the court set a trial date for June 15, 2015. This means an initial trial date was set for 110 days out, or 40 days past the time required by the Speedy Trial Act. *See* § 3161(a). On June 4, 2015 an ends-of-justice continuance was granted moving the trial to October 13, 2015 based upon the stipulation of the parties. *See* Docket 30. The stipulated order miscalculates the time elapsed on the Speedy Trial clock by restarting the time at the arraignment date rather than indictment. But, assuming the validity of the ends-of-justice order, 99 days elapsed unless automatically excluded by the Speedy Trial Acts other provisions. Motions that automatically excluded time were arguably pending from April 7, 2015 to April 29, 2015 (23 days) and May 27, 2015 to June 4, 2015 (9 days) leaving only 2 days remaining on the second 70-day Speedy Trial Act clock. Further, the ends-of-justice order, besides inaccurately

---

[63] Docket No. 208 at 16.

accounting for the time elapsed already, is faulty on its face because 1) it does not include any consideration of the public's interest in a speedy trial, *see Zedner v. United States*, 547 U.S. 489, 489 (2006), and 2) is based on a restatement of voluminous discovery without the relevant and now well-established, Tenth Circuit *Toombs* required inquiry into the nature of discovery and reason for the specific time requested. *See United States v. Toombs*, 574 F.3d 1262, 1272 (10th Cir. 2009). Thus, the Speedy Trial Act was violated for a second time without Mr. Joseph's counsel taking any action or advising him (or the court) of the same. This is particularly significant since 1) it represents a second Speedy Trial Act violation and thus a pattern of governmental and court neglect violating federal law on the issue of speedy trial rights, twice for Mr. Joseph; and 2) it is combined with defense counsel's failure to argue the pattern of neglect by prosecutors in its faulty ends-of-justice orders.

The Supreme Court has said that a "pattern of neglect" is sufficient to tip the balance in favor of dismissal with prejudice - *see United States v. Taylor*, 487 U.S. 326, 339 (1988), and thus this ineffective assistance of counsel seriously prejudiced Mr. Joseph. Evidence at the hearing on this motion can further establish the pattern of neglect in managing the Speedy Trial Act clock in Mr. Joseph's case and thus prejudice.

### CONCLUSION

Despite other good qualities and performances, "[t]he lawyer who does not probe, does not inquire, and does not seek out all the facts relevant to his client's case is prepared to do little more than stand still at the time of trial. (*Smotherman v. Beto*, 276 F.Supp. 579, 588 (N.D.Tex.1967).)" *McQueen v. Swenson*, 498 F.2d 207, 217 (8th Cir. 1974). The ineffective assistance of counsel at issue here as previewed above, has resulted in the violation of Mr. Joseph's Fifth Amendment Due Process guarantees as well as his Sixth Amendment assistance

of counsel guarantees.  As such, the court should vacate the prior judgement and sentence,

dismiss the case with prejudice, or order a new trial.


Dated this 8th day of November 2018.

*/s/ J. Morgan Philpot*
J. Morgan Philpot, USB #11855
Attorney for Defendant, Gabriel Joseph


STATEMENT OF VERIFICATION OF FACTS

I declare under penalty of perjury that foregoing factual statements are true and correct.


Executed on this 8th day of November 2018.

*/s/ Gabriel S. Joseph*
Signed electronically by J. Morgan Philpot with
*Permission and Authorization of Gabriel S. Joseph*