JOHN W. HUBER, United States Attorney (#7226)
TYLER L. MURRAY, Assistant United States Attorney (#10308)
JACOB J. STRAIN, Assistant United States Attorney (#12680)
Attorneys for the United States of America
111 South Main Street, No. 1800 Salt Lake City, Utah 84111
Telephone: (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GABRIEL SETH JOSEPH,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Case No. 2:19-cv-00140-JNP<br><br>**ANSWER TO PETITIONER'S MOTION TO VACATE JUDGMENT AND SENTENCE**<br><br>District Judge Jill N. Parrish |

*"No effective judicial system can afford to concede the continuing theoretical possibility that there is error in every trial and that every incarceration is unfounded. At some point the law must convey to those in custody that a wrong has been committed, that consequent punishment has been imposed, that one should no longer look back with the view to resurrecting every imaginable basis for further litigation but rather should look forward to rehabilitation and to becoming a constructive citizen."* [1]

---

[1] *Schneckloth v. Bustamonte*, 412 U.S. 218, 262 (1973) (concurring opinion) (footnote omitted).

## Table of Contents

**I.   BACKGROUND** ...................................................................................................... 3

**II.   PETITIONER'S § 2255 MOTION** ......................................................................... 4

**III.   STANDARD FOR § 2255 & INEFFECTIVE ASSISTANCE OF COUNSEL** .............. 6

**IV.   ARGUMENT** ......................................................................................................... 9

*Ground 1: Trial Counsel Advised Mr. Joseph not to Testify.* ................................. 13

*Ground 2: Trial Counsel Blamed the Bank and Blamed Shannon Spangler* ...................... 17

*Ground 3: Trial Counsel "Refused" to Investigate or Present Mr. Joseph's Defense of Good Faith Reliance on the Advice of Legal Counsel.* .................................................. 24

*Ground 4: Trial Counsel Failed to Investigate or Present Other Legitimate Defenses at Trial.* .................................................................................................................. 28

*Ground 5: Trial Counsel Failed to Investigate or Present Expert Accounting Testimony.* . 29

*Ground 6: Trial Counsel Failed to Investigate or Defended Tax Charges.* ......................... 32

*Ground 7: Trial Counsel Failed to Object to Jay Garlick's testimony.* ............................... 33

*Ground 8: Trial Counsel Failed to Object to the United States' closing argument Referencing Jay Garlick's testimony.* ...................................................................... 37

*Ground 9: Trial Counsel Failed to Request a Limiting Instruction Regarding Jay Garlick's Testimony.* ......................................................................................................... 39

*Ground 10: Trial Counsel Failed to Request a Duty to Disclose Jury Instruction* .............. 40

*Ground 11: Trial Counsel Failed to Advocate for Mr. Joseph's Speedy Trial Rights.* ......... 43

**V.   AN EVIDENTIARY HEARING SHOULD BE CONDUCTED** .................................... 46

**VI.   PETITIONER WAS CONVICTED BY AN OVERWHELMING WEIGHT OF EVIDENCE** ....................................................................................................... 47

**VII. CONCLUSION** ..................................................................................................... 49

In his Motion to Vacate Judgment and Sentence Pursuant to 28 U.S.C. § 2255 ("Petitioner's Motion"), the Petitioner asks this Court to grant him the dramatic and extraordinary relief of vacating the jury verdict, vacating the sentence, and dismissing the case with prejudice; or in the alternative, granting a new trial.

Pursuant to Rules 5 and 12 of the Rules Governing Section 2255 Proceedings for the United States District Courts and Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, the United States respectfully submits this Answer in opposition to the Petitioner's Motion and moves to dismiss the Petitioner's Motion.  For the reasons set forth below, the Court should deny and dismiss the Petitioner's Motion as meritless.

The United States' motion is based on the grounds that none of the claims meet the *Strickland* standard showing his defense counsel was ineffective or that the Petitioner suffered any prejudice as a result.

## I.     BACKGROUND

After a jury trial, Mr. Gabriel Joseph was convicted of 4 felonies and a misdemeanor on November 3, 2015 (two counts of wire fraud, in violation of 18 U.S.C. § 1343, one count of money laundering, in violation of 18 U.S.C. § 1957, one count of making a false statement to a bank, in violation of 18 U.S.C. § 1014, and one count of willfully failing to file a tax return, in violation of 26 U.S.C. § 7203).[2]

Months later, after extensive briefing, evidentiary hearings, and argument, the Court sentenced Mr. Joseph to 78 months' incarceration, the low end of the Guideline range, and ordered Mr. Joseph pay restitution and forfeiture.[3]  Although he sought (and was denied) "emergency"

---

[2] *See U.S. v. Gabriel Joseph*, Case No. 2:15cr103, ECF Docket No. 124.
[3] *Id*. at ECF Docket No. 172, 173, and 182.

relief just days before the Court-ordered self-surrender date,[4] Mr. Joseph did self-surrender to federal custody on or about July 11, 2016.[5]

After extensive briefing and oral argument, on September 1, 2017, the Tenth Circuit Court of Appeals affirmed the judgements of this Court.[6]

## II.   PETITIONER'S § 2255 MOTION

Mr. Joseph, through J. Morgan Philpot (his seventh attorney of record in this case)[7] identifies exactly eleven grounds for collateral relief.  To the extent that Petitioner has failed to raise other grounds for relief in his § 2255 Motion, he has now waived them, and any effort he makes to raise new grounds for relief in response to this Answer would be untimely, waived, and procedurally barred.[8]

Petitioner claims he was denied effective assistance of counsel because Mr. Richard Mauro (Petitioner's trial counsel) allegedly

(1)   Advised Mr. Joseph not to testify;

(2)    Adopted an incompetent trial strategy of blaming the bank and blaming a mortgage broker, Shannon Spangler;

(3)   Failed to adequately investigate an advice of counsel defense involving counsel at Ray Quinney & Nebeker, Douglas Matsumori;

---

[4] *Id*. at ECF Docket No. 193.
[5] *Id*. at ECF Docket No. 194.
[6] *Id*. at ECF Docket No. 208.
[7] Previous counsel includes Daryl Sam; Clayton Simms; Steven Killpack; Richard Mauro; Joshua Ostler; and Marcus Mumford.
[8] *United States v. Lee Vang Lor*, 706 F.3d 1252, 1256 (10th Cir. 2013) ("[i]n civil cases ... a party waives an issue in the district court if he waits to raise the argument until his reply brief' and applying the rule to § 2255 motions)(internal quotation marks and citations omitted); *see also United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived."); *Thompkins v. McKune*, 433 Fed. Appx. 652, 660 (10th Cir. 2011)(unpublished) ("[A]rguments raised for the first time in a traverse are not properly presented to the district court...." (citations omitted)); *United States v. Cook*, 997 F.2d 1312, 1316 (10th Cir. 1993) *(citing Lucero v. United States,* 425 F.2d 172, 173 (10th Cir.1970))("To the extent that he failed to raise these grounds in his § 2255 motion to the district court, he has waived them"); *United States v. Edmonson*, 107 F.3d 22 (10th Cir. 1997)(unpublished table decision); 28 U.S.C. § 2255(f)("A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of the date on which the judgment of conviction becomes final….").

(4)    Failed to adequately investigate that Mr. Joseph made good-faith representations regarding his income, assets and owner occupancy status;

(5)    Failed to hire an expert to testify as to the accounting records;

(6)    Failed to investigate and challenge the tax charge and a potential advice of counsel defense involving tax attorney Joseph Thibodeau;

(7)    Failed to object to Jay Garlick's testimony;

(8)    Failed to object to the United States' closing argument referencing Jay Garlick's testimony;

(9)    Failed to request a limiting instruction regarding Jay Garlick's testimony;

(10)  Failed to request a "duty to disclose" jury instruction; and

(11)  Failed to advocate for Mr. Joseph's Speedy Trial Rights.

These grounds are insufficient for relief under § 2255 because they are meritless and based on fabricated facts and unsupported conclusory assertions by the Petitioner.

As part of the discovery process in this case, the United States deposed Richard Mauro on September 18, 2019 and received a small portion of his client file; interviewed Joseph Thibodeau on September 25, 2019 and received a portion of his client file; and interviewed Douglas Matsumori on October 3, 2019 and received a number records from Ray Quinney & Nebeker ("RQN").  To accomplish these investigative tasks the United States moved this Court for an order waiving attorney-client privilege;[9] a formal order for discovery;[10] and a compulsory order for these attorneys to comply with confidentiality rules imposed by 1.6 of the Rules Professional Conduct.[11] The representations by these attorneys during their interviews and the information in their client files are almost entirely in direct contradiction to the Petitioner's assertions.

Only a small portion of Richard Mauro's client file was provided to the United States

---

[9] *Gabriel Joseph v. U.S.*, Case No. 2:19cv140, ECF Docket No. 4.
[10] *Id*. at ECF Docket No. 10.
[11] *Id*.

because, as Mr. Mauro testified under oath during his deposition, when he was terminated as counsel for Mr. Joseph after the trial, Joshua Ostler requested the client file.  Mr. Mauro knew that Mr. Joseph had limited funds for copying the file and thus provided Mr. Ostler with his original client file.  When the United States reached Joshua Ostler, he explained that he had provided Mr. Mauro's client file to Marcus Mumford.

The United States moved this Court for an order to compel Marcus Mumford to return the client file to Richard Mauro so that Mr. Mauro can comply with the discovery order,[12] and the Court granted that order to compel.[13]  Mr. Mumford has yet to comply because Mr. Mauro is out of town, and given the deadline for filing this response, the passage of time, and the transfer of the files from Mr. Mauro's possession, there is no way to ensure the files will be complete. Accordingly, the United States must proceed with its Answer without the benefit of the original, unaltered client file of Mr. Mauro.

## III.   STANDARD FOR § 2255 & INEFFECTIVE ASSISTANCE OF COUNSEL

In 1948, Congress enacted 28 U.S.C. § 2255 allowing federal prisoners to collaterally attack their convictions by filing a motion rather than a habeas petition in the district in which they were convicted and sentenced rather than in the district of their confinement.  The procedural default doctrine reflects the "general rule" that "claims not raised on direct appeal may not be raised on collateral review."  However, one exception to this rule involves claims of ineffective assistance of counsel.[14]  In *Massaro v. United States*, the Supreme Court held that criminal defendants may raise ineffectiveness claims for the first time during a 28 U.S.C. § 2255 proceeding.[15]   The *Massaro* Court recognized that such claims are rarely well-suited to

---

[12] *Id*. at ECF Docket No. 22.
[13] *Id*. at ECF Docket No. 23.
[14] *Massaro v. United States*, 538 U.S. 500, 504 (2003).
[15] *Id*.

adjudication on direct review because of the need for further factual development.[16]

The "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."[17]  Nor does the Sixth Amendment guarantee that every imaginable defense will be raised.[18]  To prevail on an ineffective assistance of counsel claim, the Petitioner must show that his lawyer's performance fell below an objective standard of reasonableness, and that such deficient performance was actually prejudicial.[19]  A failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.[20]

To prove deficiency, the Petitioner must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[21] "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[22] But, "[j]udicial scrutiny of counsel's performance must be *highly deferential*,"[23] particularly when considering matter of trial strategy, which reviewing courts are often "ill-suited to second-guess."[24]  Deficiency requires that "[c]ounsel's performance must be 'completely unreasonable' to be constitutionally ineffective, not 'merely wrong.'"[25]  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." [26]

---

[16] *Id*. at 1624-25.
[17] *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)(per curiam).
[18] *See, Engle v. Isaac*, 456 U.S. 107, 134 (1982).
[19] *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984).
[20] *Id*. at 687.
[21] *Id*.
[22] *Id.* at 689 (citation omitted).
[23] *Id.* (emphasis added).
[24] *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998).
[25] *Wilson v. Sirmons*, 536 F.3d 1064, 1083 (10th Cir.2008) (*quoting Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir.1997)).
[26] *Strickland*, 466 U.S. at 689; *accord Hanson v. Sherrod*, 797 F.3d 810, 828 (10th Cir. 2015).

As the *Strickland* Court recognized, "There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way."[27] "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[28]  Trial counsel is not obligated to advance every issue that might possibly be raised, even those requested by defendant.  Indeed, it is reasonable and effective for trial counsel to winnow out weaker arguments and focus on a few key issues.  Thus, a "strong presumption" exists that counsel's performance "falls within the wide range of reasonable professional assistance"[29] even where "a course of action (or inaction) [] seems risky, unorthodox, or downright ill-advised."[30]

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[31]  The Petitioner must show that counsel's deficient performance "actually had an adverse effect on the defense."[32]  To prove this prejudice, the Petitioner must show that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."[33]  He "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[34]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[35]  A defendant cannot establish prejudice merely by showing that counsel's errors had "some conceivable effect" on the outcome of the proceeding because

---

[27] *Id*.
[28] *Id*. at 688.
[29] *Id*.
[30] *Tippins v. Walker*, 77 F.3d 682, 687 (2d Cir. 1996).
[31] *Strickland*, 466 U.S. at 691.
[32] *Id.* at 693.
[33] *Id.* at 687.
[34] *Id.* at 694.
[35] *Id.*

"[v]irtually every act or omission of counsel would meet that test."[36]  This prejudice standard is "rigorous" and "highly demanding."[37]

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."[38]  If either prong is not proven, Petitioner's § 2255 fails.  Moreover, "in deciding the merits of a Sixth Amendment claim, [the court] consider[s] the sufficiency of counsel's overall performance," not each particular decision in isolation otherwise, it becomes "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."[39]

## IV.   ARGUMENT

Mr. Joseph misidentifies his trial counsel, Richard Mauro, as an overworked, underpaid "public defender."[40]  Mr. Mauro was, in fact, a successful private criminal defense attorney paid for and appointed by the Court through the Criminal Justice Act ("CJA").[41]  After a clerkship with the Utah Court of Appeals, Mr. Mauro became a criminal defense lawyer in 1990 and has litigated almost every conceivable kind of criminal case: domestic assault, rape, sexual assault, drug possession and distribution, theft and burglary, aggravated assault, felony DUI, automobile homicide, complex federal drug conspiracy and racketeering, mail fraud, wire fraud, bank fraud, child pornography, and capital murder.  Mr. Mauro is a former adjunct professor at the University of Utah College of Law, past president of the Utah Association of Criminal Defense Lawyers, has

---

[36] *Id*. at 693.
[37] *Kimmelman v. Morrison*, 477 U.S. 365, 381-82 (1986).
[38] *Strickland*, 466 U.S. at 697.
[39] *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986)(citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).
[40] Petitioner's Motion at 3.
[41] After the trial with Gabriel Joseph was concluded, Mr. Mauro became the Executive Director Salt Lake Legal Defender's Association.

been recognized as one of The Best Lawyers in America, and has been voted by his peers as one of the Best Lawyer's in Utah.

At the time of Mr. Joseph's trial, Mr. Mauro estimates he had tried to verdict somewhere over fifty (50) felony jury trials and about two-hundred (200) misdemeanor trials.[42]   He had significant previous experience with litigating complex white-collar felony cases in both state and federal court.[43]   In short, Mr. Mauro has an impressive record of experience and enjoys a strong reputation among the bar as a professional, thorough, and competent attorney.

Mr. Mauro testified that he met with Mr. Joseph in person often (he estimates at least 15 times) leading up to the trial and had frequent phone conversations because Mr. Joseph was living in California.[44]   He also reported that he had difficulty in obtaining records from Mr. Joseph, something that was confirmed by Douglas Matsumori who stated that Mr. Joseph was not a very cooperative client and it was difficult to obtain records from him.[45]   Mr. Mauro estimated that he spent somewhere around 500 hours working on Mr. Joseph's case which is comparable to defending other complex white collar cases.[46]   Mr. Mauro also estimated that during trial, besides the time in court, he spent around five to ten hours at night preparing for the next day.[47]

In the months leading up to trial, Mr. Mauro reviewed all the discovery and conducted legal research into the charges;[48] met with Gabriel Joseph and attempted to obtain records from him;[49] hired an investigator named Ted Cilwick to find and interview witnesses and conduct background

---

[42] Deposition of Richard Mauro on 09.18.2019, Transcript 5:24-25; 6:1-2.
[43] *Id*. at 6:9-20; 7:2-6.
[44] *Id*. at 10:3-17.
[45] Interview of Douglas Matsumori, 10.03.2019.
[46] Deposition of Richard Mauro on 09.18.2019, Transcript 11:11-15.
[47] *Id*. at 11:22-23.
[48] *Id*. at 12:15-22.
[49] *Id*. at 13:1-6.

checks;[50] interviewed numerous of witnesses including some in Washington DC;[51] recruited Brad

Anderson, a third-year law student, to assist in the trial;[52] and settled on a defense strategy.[53]

Originally, the indictment charged Mr. Joseph with three distinct transactions, two of which were

later dismissed just before trial.[54] Mr. Mauro tracked down and interviewed all of the individuals

involved in the two transactions that were dismissed and was prepared to call some as witnesses.[55]

Mr. Mauro described his robust pretrial interview practice in the case as follows:

> I went to Washington on one occasion to interview witnesses. I tracked down all of the witnesses on the other two counts, the Seattle mortgage company counts, because the original -- I think it's the River Bottoms and the other Orem property, the two loans on those properties, so I tracked down all those witnesses. I interviewed all those witnesses. I spoke to all those witnesses. And then I started working on the Red Trail. I tracked down, spoke to most of those witnesses. I think all of those witnesses I found.  I mean, there was -- some of the Washington Mutual people wouldn't talk to me. There was a guy named Mark Maughan, who was on the Orem property. Eventually those charges were dismissed before trial. He wouldn't talk to me. Don't think -- I think I got ahold of Sanudo. She wouldn't talk to me. And then a couple of people had lawyers. So I did talk to a fellow named Jim Robinson and a guy named Jim Harusa, who were guys at Seattle Mortgage who worked with WaMu, and I had lengthy interviews with them, and, frankly, was prepared to kind of -- I think that they were helpful in a sense that I think Robinson would say, "Look, I didn't find anything fraudulent or unlawful about the application process or things that Joseph was doing at the time." And so those witnesses, obviously, didn't become witnesses when those charges were dismissed before trial.[56]
> ….
> I know we interviewed a number of appraisers relative to this property to get their input about this -- about the viability of this appraisal for $7 million. And ultimately the appraiser -- and then tracked down the appraiser that did this appraisal, who appraised the property for $7 million. We did some interviews with some other appraisers who had some sort of ancillary information about these

[50] *Id*. at 69:1-16.
[51] *Id*. at 15:16-25; 16:1-25; 17:1-9.
[52] *Id*. at 70:9-19.
[53] *Id*. at 13:13-25; 14:1-14.
[54] *U.S. v. Gabriel Joseph*, Case No. 2:15cr103, ECF Docket Nos. 1 and 70.
[55] Deposition of Richard Mauro on 09.18.2019, Transcript 15:18-25; 16:1-17.
[56] *Id*. at 15:16-25; 16:1-17.

appraisals and about this piece of property.[57]

....

So I tried to interview all of the people that were involved in the Red Hawk property. It would have been Gabe Chasney. There's another real estate fellow. I tried to interview David Allen. He wouldn't talk to me. He was your first witness, I think. I interviewed Julie somebody or other from Park City. She was involved in part of the real estate transaction. The appraisers. I interviewed the appraisers, Gerhardt or -- I think Gerhardt. I can't remember the appraiser's name. We interviewed an appraiser. There was a second appraiser that we found whose office was out in Sandy. My investigator and I went down there. He had a lot of information about this property.... I tried to find the investigator from WaMu that you have identified and interview him. I interviewed the people in Washington on either the Orem property -- both on the Orem property and the River Bottoms property. Tried to talk to Mark Maughan. He wouldn't talk to me. There were a number of witnesses that I tried to contact that wouldn't talk to me. Shannon Spangler's lawyer indicated that she wouldn't talk to me. I tried to find Sanudo but couldn't find her before the trial. And I can't remember when she became a witness. I also tried to find the other witnesses that were listed, Susan Montgomery, and there was a Ryan Judd, and there was a third witness that was involved in the putting together of the loan documents and the underwriting of the loan at Washington Mutual.... Interviewed the Adamses. Interviewed Brandon Adams. Interviewed Katie Adams. Interviewed a friend, Brian Holt, a friend of Gabe's who was here in town when the Adamses came to town. He didn't have any information about any of the specific events relative to these transactions, but he was a person that had invested in some of Mr. Koerber's companies. And he had some information about his ideas about what that investment looked like....I had several interviews with Lisa Garner....Q. What about -- you called three witnesses, I think, at trial. Cara Milgate? A. Uh-huh. Q. Paul Rademaker? A. Yes. Q. And Glenn Traylor? Obviously, you'd interviewed those. A. Interviewed them before calling them. Yes.[58]

Mr. Mauro testified under oath that he did not feel that obligations to other clients limited his ability to serve Mr. Joseph in any way, he felt like he gave this case the time and attention it deserved, and he devoted the necessary resources to putting on a good defense.[59]

---

[57] Deposition of Richard Mauro on 09.18.2019, Transcript 21:8-18.
[58] *Id*. at 72:7-25; 73:1-25; 74:1-21.
[59] *Id*. at 71:7-15.

The evidence shows Mr. Mauro thoroughly investigated and litigated this case, going well above an objective standard of reasonableness. The efforts outlined above, combined with the sound trial strategy, demonstrate that Mr. Mauro was constitutionally effective under the Sixth Amendment.

### Ground 1: Trial Counsel Advised Mr. Joseph not to Testify.

First, Mr. Joseph complains that Mr. Mauro was ineffective in advising him not to testify (Mr. Joseph's "preferred approach"), because his testimony would have established a "factual innocence defense."[60] There is a strong presumption that Mr. Mauro adopted a sound trial strategy when he advised Mr. Joseph not to testify.[61] A tactical decision by counsel that is not objectively unreasonable, but with which the defendant disagrees, does not constitute ineffective assistance of counsel.[62]

The Petitioner's Ground 1 is easily extinguished by the fact that it was Mr. Joseph himself who ultimately made the decision not to testify. Mr. Mauro confirmed that Mr. Joseph's decision not to testify was not finalized until the last day of trial.[63] Mr. Mauro testified that he advised Mr. Joseph "several times" about his important right to testify and that it was "his decision."[64] If Mr. Joseph disagreed with the sound advice of his trial counsel, he could have taken the stand on his own accord and pursued his "preferred approach."

The risks with Mr. Joseph taking the stand were legion. In order to obtain a more favorable interest rate, Mr. Joseph misrepresented to WAMU that he would occupy the Red Hawk property

---

[60] Petitioners Motion at 5, footnote 19.
[61] *Hanson v. Sherrod*, 797 F.3d 810, 828 (10th Cir. 2015).
[62] *Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984); *see also Hughes v. Borg*, 898 F.2d 695, 703 (9th Cir. 1990).
[63] Deposition of Richard Mauro on 09.18.2019, Transcript 39:22; *see also* Trial date 11.02.2015, Transcript 728:2-7 ("THE COURT: I'm just wondering if I can get a sense from the defense as to how long your case will be, when we need to get jury instructions decided and that kind of thing. MR. MAURO: I have three potential witnesses, and maybe Mr. Joseph.").
[64] Deposition of Richard Mauro on 09.18.2019, Transcript 40:2-10.

as his primary residence. Mr. Joseph now claims he would have testified, among other things, "that he had [sic] work remotely from the property and would use it as second home initially and eventually move and live there full time."[65] However, Mr. Mauro testified in his deposition that Mr. Joseph confessed to him that "he [Mr. Joseph] was a property investor, and the Red Hawk Trail was an investment property, not a property to live in."[66] Mr. Mauro was not ineffective by advising Mr. Joseph not to testify; especially since it appears, based on his current filing, Mr. Joseph would have perjured himself.

Also, had Mr. Joseph testified, he would have opened himself up to impeachment regarding the two additional fraudulent transactions that were dismissed from the indictment. As Mr. Mauro explained in his deposition, "I had a very frank discussion with [Mr. Joseph] about testifying because I was very concerned about the admission of the other two counts that had been dismissed and the arguments that could derive from those two counts that were dismissed and the evidence that would come in."[67] Although the United States dismissed these counts from the indictment, it still possessed the loan applications filled out and signed by Gabriel Joseph, and these would have been used to argue a pattern of fraud, including the fact that Mr. Joseph reported ever-increasing income during the summer of 2007, even though he knew that his primary source of income, payments from Rick Koerber's Founders Capital (which turned out to be a massive Ponzi scheme), had ceased after May 2007. Mr. Mauro explained his sound strategy on this front: "My concern was the pattern of fraud….And that information otherwise wouldn't have been admissible…. [S]o I said, 'It's your call to make, but I would caution you about testifying because I think that information will come in and will be used against you in a way that won't be helpful.'"[68] At that

---

[65] Petitioner's Motion at 5, footnote 1.
[66] Deposition of Richard Mauro on 09.18.2019, Transcript 42:11-13.
[67] *Id*. at 40:5-10.
[68] *Id*. at 40:21-25; 41:1-4.

point in the trial, Mr. Mauro also had a sense that he had done a good job "at trying to really undermine the government's case," which was another strategy he pursued and that ultimately, Gabriel Joseph agreed with him that it would be best not to testify.[69]

This, of course, is consistent with the trial record. The Court did not formally rule that the other two transactions would be admissible against Mr. Joseph should he testify, but it did make this statement on the record:

> And I think, Mr. Mauro, for your purposes, I think Mr. Walz has persuaded me that there is evidence with respect to those subsequent loan applications that could be relevant should Mr. Joseph choose to take the stand. Of course the specific ruling would be dependent as to the content of Mr. Joseph's testimony, and I don't believe that I can rule right now in a vacuum without hearing what he might say and seeing what questions the government poses on cross-examination. But at this point, I am unwilling to -- or I can't conclude that it would not be a possibility that I would allow this in if Mr. Joseph chooses to take the stand.[70]

Finally, Mr. Mauro was successful at establishing a "factual innocence defense" without assuming the risks of putting on Mr. Joseph's testimony. He argued forcefully at closing that Mr. Joseph provided truthful information in his loan application and that the financial information that

---

[69] *Id*. at 41:15-25; 42: 1-2.
[70] Trial date 11.02.2015, Transcript 663:9-20.

he provided was accurate,[71] that the appraisal was genuine,[72] and if there was fraud in the case, it was committed by the loan broker, not Mr. Joseph.[73]

The Petitioner cannot demonstrate that Mr. Mauro was ineffective for advising him not to testify. It bears noting that all of the Petitioner's proposed testimony was directly contradicted by the overwhelming weight of the evidence presented at trial, making it likely to be perceived as unbelievable, at best.[74]  Defense counsel is not required to present evidence that is "either highly implausible or dramatically impeachable."[75] It cannot even be claimed that this advice was an error so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment.  In fact, given the risks, if Mr. Mauro had advised Mr. Joseph to testify, Petitioner would be nearer to proving ineffectiveness.  Mr. Mauro performed in a reasonable and professional way advising Mr. Joseph to avoid taking the stand.  Likewise, the Petitioner cannot demonstrate the *Strickland* standard for prejudice because all of the same defenses that would have been raised had he taken

---

[71] Trial date 11.03.2015, Transcript 818:21-23 ("This is accurate, honest, truthful information that was provided to the bank."), 816:7-18 ("We had the special agent on yesterday who said, yeah, those are his bank statements. Is there anything fraudulent about them? Well, no, it doesn't seem to be fraudulent about them. Is there anything misrepresented in those? No. Well, surely there's something wrong with these. No, no, they seem to be accurate, what the bank wanted to get. Well, what do they show? Well, they show two things. They show money that goes into the bank and they show money that goes out of the bank. Why is that important? What's fraudulent about the bank seeing money that goes in and money that goes out? That's not fraud."), 824:13-19 ("In all of the documents that I just showed you that they claim are part of the scheme or artifice to defraud, there's nothing fraudulent in any of those documents, and there isn't one witness that said there was. All of the witnesses that they called, and they were their witnesses that laid the foundation, said there's no fraud with those documents. That's not a scheme or artifice to defraud."), 841:20-25 ("What he did wasn't a scheme or artifice to defraud. It's how business was done. It's what happened. It was based on the appraisal amount. It's not a scheme or artifice to defraud. He didn't mislead anyone. He didn't lie to anybody. The documents that went in were all truthful documents, and the witnesses all attested to the truthfulness of them on the witness stand. That's not a scheme or artifice to defraud."); *see also* 842:14-25, 843:1-11.

[72] *Id*. at 823:1-12 ("The appraisal, let's talk about the appraisal for a minute because the appraisal is not a scheme or artifice to defraud.").

[73] *Id*. at 812:2-6 ("I think we can probably figure out who it was that filled out the form. I don't think it takes a rocket scientist at this point in the trial to figure out that it was someone working for Marblestone, someone named Shannon Spangler. That's really kind of the whole problem with this case, isn't it?"); *see also* Deposition of Richard Mauro on 09.18.2019, Transcript 22:8-13.

[74] *See United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984) (finding that although a criminal defendant has a constitutional right to testify *truthfully* on his own behalf, he "has no constitutional right to testify perjuriously in his own behalf").

[75] *See Thomas v. Bowersox*, 208 F.3d 699, 702 (8th Cir.2000).

the stand, were in fact, raised at the trial as outlined above. Nothing in the Petitioner's Ground 1 undermines confidence in the outcome of the trial. Based on the options available to Mr. Mauro, this strategy was not unreasonable.

### Ground 2: Trial Counsel Blamed the Bank and Blamed Shannon Spangler

Next the Petitioner complains that Mr. Mauro adopted a "legally untenable and incompetent" defense that was no defense at all by blaming WAMU and blaming Shannon Spangler.[76] The Petitioner mischaracterizes these strategies as the "only two defenses" raised by Mr. Mauro[77]—this is completely inconsistent with the record. These defenses were only small part of Mr. Mauro's litigation strategy, and Mr. Mauro disagrees with the Petitioner's characterization.[78]

Mr. Mauro made a factual innocence defense and argued that Gabriel Joseph lacked the specific intent to defraud as outlined above.[79] He also attacked the memory and credibility of many of the government's witnesses.[80] Mr. Mauro fully attacked the sloppiness of the investigation (calling it an "invent-igation"), the imprecision of the indictment, and the alleged unfairness of the prosecution.[81] He identified significant missing records from the transaction and

---

[76] Petitioner's Motion at 6.

[77] Petitioner's Motion at 7.

[78] Deposition of Richard Mauro on 09.18.2019, Transcript 34:4-8 ("I think it was probably broader than that. I mean, I argued certainly more than that in the closing, and I think the evidence was -- I think the most important evidence was really the applications and the loans that we argued weren't dishonest in any way.")

[79] *See also* Trial date 11.03.2015, Transcript 827:4-7 ("I don't want to cheat anybody. If it's worth $7 million, I'll buy it. What's the difference between that and applying for a home equity loan where you have to get an appraisal on your home? There isn't a difference.").

[80] Trial Date 11.03.2015, Transcript 822:7-13, 19-25 ("When you don't have any way really of challenging it and you are a defendant on trial with your freedom at stake and some guy comes and says ten years later I remember this phone conversation about a loan that didn't exist, judge that evidence for what you will. I would suggest to you it's not very good evidence."); 830:10-18 ("Ms. Sanudo is a savvy witness and figured out right away, about 20 seconds within the time that the FBI called her on September 21st of this year for the first time, eight and a half years after she underwrote the loan, and she was able to look at some documents. Here's what the FBI said. Hey, we're looking at a fraudulent loan. You're involved in the fraudulent loan activity. Natural tendency of anybody like Ms. Sanudo is to hop on team USA and try to cooperate with them."); 834:24-25 ("John Gerhardt made $100,000 on this loan, $100,000. Shannon Spangler made $218,000 on this loan.").

[81] Trial Date 10.28.2015, Transcript 22:12-16 ("Was Gabe part of SCIPC? Yeah. He named it after his wife, Shandi's Cabin In Park City. By the way, these guys didn't know that until last month, the investigators that did that

protested the absence of a number of witnesses the United States failed to call.[82]  He also made the

argument that contractually, the occupancy agreement was contingent upon the loan application,

which he argued the evidence established Gabriel Joseph did not fill out.[83]  Finally, Mr. Mauro

passionately argued reasonable doubt.[84]

In reality, Mr. Mauro adopted a nine-tiered defense strategy: (1) The investigation was

sloppy and poorly performed; (2) The prosecution was imprecise and unfair; (3) Mr. Joseph was

---

case. They will tell you they knew before that, but they didn't. So you go, okay, so is that illegal? No."); Trial Date 11.03.2015, Transcript 815:6-11 ("And that's not how you prosecute people in the United States of America. You prosecute people when you have evidence. You prosecute people when you present it to a grand jury. You prosecute people when you swear people under oath and present that evidence to the promise that we hold the United States to, because they have lots of power."); 816:21-25, 817:1 ("Now I listened to Agent Marker's testimony yesterday and he spent -- with all due respect, he didn't spend quite as much time interviewing witnesses, but spent quite a bit time kind of coloring in a computer thing that we looked at, which was cool and colorful, but I didn't understand -- and maybe it's because I'm a lawyer."); 840:3-12 ("That's not how you investigate cases, or inventigate them, as my friend calls them. That's not how you do it. It's not fair. It's not fair to him. It's not fair to us as citizens. It really isn't fair to us. That's the unfair part about it, that as you're coming up to trial, we call you folks in to sit down as a jury. So when did you develop that evidence? We developed that evidence in the middle of October, a week before the trial.") 841:2-17 ("And then said, okay, great, well, so what you know, then, is that this loan application has a phone number on it, Special Agent? Yeah, it does. And what you know, then, is that phone number, did you try to find out whose phone number that was? Well, no. Well, wait a minute, somebody told you that this document is a false document that has a phone number. Maybe they don't have Google at the IRS, but all you need to do is Google that to find the phone number. Of course, we heard from Cara Milgate this morning. She said, that's my phone number. That's not a hard thing to do. It's a basic and it's a fundamental thing. And, my God, it's unfair to Gabe Joseph to have that kind of investigation done in this case and then for them to try to support a guilty verdict with that. It's just fundamentally unfair.").

[82] Trial Date 11.03.2015, Transcript 838:20-25, 839:1-2 ("Don't you think that before you say, hey, we're going to convict a guy for signing this affidavit that references very specifically this application that is supposed to be in the file, that we maybe should look at the application that Gabriel Joseph signed before we take somebody's freedom away. I mean, how hard is that? How hard is that for the government to produce that document if it exists? How hard?"); 839:21-25, 840:1-2("The other person that you haven't heard from is Dave Ingle. Dave Ingle's name is all over this. Where is David Ingle? Why isn't he here? What role did he have? What information does he have? Does he have a file? What does it look like? What information is there? He's in a couple of documents, and that's all we know about him. He hasn't been produced. He hasn't testified.")

[83] Trial Date 11.03.2015, Transcript 837:17-22 ("Let me suggest something about this intent to occupy. Gabe Joseph -- the evidence in this case says Gabe Joseph told John Gerhardt that he was buying the property for investment purposes. He didn't acknowledge the loan application. He didn't have anything to do with the loan application that is in this case.").

[84] Trial Date 11.03.2015, Transcript 846:7-22 ("The law doesn't require him to prove innocence. It's the burden of proof on the government. That is a super, super, super important thing to keep in mind when you go back and deliberate. It's the most important. It's what sort of keeps us all honest, if you will. Here's a paragraph I'm going to read. Reasonable doubt may arise not only from the evidence produced, but also from the lack of evidence. This says, the prosecution must prove Mr. Joseph guilty beyond a reasonable doubt. Mr. Joseph has the right to rely on the failure of the prosecution to establish that proof. Mr. Joseph may also rely on evidence brought out on cross-examination of witnesses for the prosecution. The law does not impose upon Mr. Joseph the burden or duty of producing any evidence at all. Let me suggest to you that's what this case is about.").

totally honest in all his dealings with and representations to the bank and had no intent to defraud; (4) If there was fraud, it was on the part of the loan broker; (5) None of the representations mattered to the bank anyway because of lax underwriting standards, and information about Mr. Joseph's involvement SCIPC was publicly available at the Summit County Records Office; (6) Certain government witnesses were biased and had motive to lie; (7) There were significant documents, records, and witnesses that were missing; (8) The financial meltdown prevented Mr. Joseph from repaying the loans (not intent to defraud); and finally, (9) The United States did not meet its burden of proving the case beyond a reasonable doubt.

Mr. Mauro vigorously defended Mr. Joseph, and made a number of arguments.  It is a hornbook principle that the burden of proof is on the prosecution, and the defendant does not have to testify or present any evidence to prove innocence.  Accordingly, attacking the government's case and arguing reasonable doubt can be, and often is, a viable, reasonable, and effective defense strategy that can easily survive the *Strickland* standard.  Mr. Mauro went above and beyond that threshold and called a number of witnesses and made other persuasive and effective arguments, as outlined.

*Bank Negligence*:  Petitioner extracts the arguments and legal research from the United States' motions in limine seeking to exclude *any* evidence of bank negligence at trial,[85] and argues that Mr. Mauro adopted an unreasonable defense because it was not legally viable.[86]  Again, this was only a small part of Mr. Mauro's overall defense strategy.

However, the Court, in a pretrial order, denied in part the government's motion to exclude all of this evidence and permitted Mr. Mauro to present evidence of WAMU's general underwriting practices and policies to assist the jury in assessing the materiality requirement of

---

[85] *See U.S. v. Gabriel Joseph*, Case No. Case 2:15-cr-00103-JNP, ECF Docket Nos. 12, 38, and 46.
[86] Petitioner's Motion at 7.

wire fraud and more specifically in determining "whether Mr. Joseph's statements were 'capable of influencing' the Washington Mutual decision-making body that considered the loan applications."[87]  Mr. Mauro eventually did enter evidence of WAMU's underwriting practices, and argued to the jury that WAMU was "finding a way to make the loans."[88]

Mr. Mauro did a significant amount of work investigating the lending practices of WAMU because he noticed that the three transactions originally charged all involved WAMU.[89] Ultimately, Mr. Mauro decided that a belt and suspenders defense for Mr. Joseph would be to establish that even if representations made to the bank were false, they did not have any material impact on the bank's decision to lend "because the underwriting standards and the underwriting practices and the methodology that the bank employed in giving loans during that period of time were very favorable and were very liberal."[90]

Because the United States found and called as a witness the actual underwriter of Mr. Joseph's loan on the Red Hawk property, Cecilia Sanudo, Mr. Mauro's approach in questioning the underwriting standards of WAMU was an effective strategy to undermine the materiality element of the wire fraud count.  He cross-examined Ms. Sanudo on WAMU's practices and entered the Senate report into evidence.  Thus, in context of the complete defense strategy (which the Petitioner mischaracterizes), Mr. Mauro's attack on WAMU's lending practices was a sound decision and had the distinct possibility of defeating an important element of wire fraud.

*Shannon Spangler*:  Petitioner, again, mischaracterizes the defense strategy stating, "Trial

---

[87] *U.S. v. Gabriel Joseph*, Case No. Case 2:15-cr-00103-JNP, ECF Docket No 51 at 4.
[88] Trial Date 11.03.2015, Transcript 832:2-12.
[89] Deposition of Richard Mauro on 09.18.2019, Transcript 13:15-21 ("And it wasn't a coincidence that it was the same bank in all three transactions, a bank called Washington Mutual. So I began to do some research on Washington Mutual to try make a determination about: If we're going to run a defense, what sort of underwriting standards did they utilize in making determinations to give loans?").
[90] Deposition of Richard Mauro on 09.18.2019, Transcript 14:4-7.

counsel's entire theory from the beginning was essentially: 'Shannon Spangler did it.'"[91]   As outlined above, this is false.  Petitioner complains that Mr. Mauro did not call Ms. Spangler as a witness and claims that "trial counsel never attempted to introduce evidence of Ms. Spangler's prior unethical and/or fraudulent conduct.[92]" This is also false.  That's exactly what Mr. Mauro did on the cross-examination of Special Agent Ron Marker.

During Special Agent Marker's testimony, Mr. Mauro was able to get into evidence (despite six objections by the United States) the entirety of damaging evidence involving Ms. Spangler.  Specifically, he was able to establish that Ms. Spangler's prior employer Cara Milgate had concerns "relative to acts of fraud committed by Ms. Spangler."[93]  Mr. Mauro also established that Paul Rademaker gave the agents "information similar, but a little bit different involving another case with activities committed -- allegedly committed by Ms. Spangler."[94]  Had Mr. Mauro called Ms. Spangler on direct, she would have denied fabricating or altering any of the information in Mr. Joseph's Red Hawk loan application.  Really, Mr. Mauro was able to suggest fraud on the part of Ms. Spangler's work on the Red Hawk transaction, without her outright denial.  It was the best of both worlds.

Mr. Mauro explained this strategy in his deposition:

> [T]here was this other woman on the side named Sharon [sic] Spangler, who we had discovered had somehow gotten ahold of information and put it into this loan application. And our theory at that point was twofold: Number one, she did it to make profit, therefore, it was in her interest to get this loan approved, and it wasn't fraud on the part of Mr. Joseph; and, number two, she did it without [Glen] Traylor knowing it or anybody else knowing it, and it was fraudulent. And, in fact, Agent Marker had been made aware of that when we cross-examined him and brought that into evidence. And so our contention was, look, ladies and gentlemen of the jury,

---

[91] Petitioner's Motion at 8.
[92] Petitioner's Motion at 9.
[93] Trial date 11.02.2015, Transcript 713:6-7.
[94] *Id*. at 715:5-7.

> if you think there's some fraud here, it certainly wasn't with Mr.
> Joseph. It was with a number of other people that were involved in
> this case, including this woman, Shannon Spangler, who I tried to
> contact, but her lawyer at the time did not allow her to talk to us.[95]

This was not a defense that was "easily dispelled" as the Petitioner argues.  Even though

Mr. Joseph appeared at closing and signed the closing documents, by pointing the finger at

Shannon Spangler as the intermediary with WAMU, Mr. Mauro was able to argue that there was

no fraudulent intent on the part of Mr. Joseph, despite any potential inaccuracies in the information

provided to the bank.

On this subject, although it appears somewhat unrelated, the Petitioner complains that Mr.

Mauro was "unexplainably dismissive of Mrs. Adams" although she could testify about:

> 1) Mr. Adam's drug use being the reason he couldn't remember any
> detail about the transactions at issue and 2) Mr. Adams and Mr.
> Joseph's original conversations about how to structure the subject
> real estate transaction as partners (he owned SCIPC, LLC which
> sold the cabin to Joseph), and specific conversations about ensuring
> the transaction was legal.[96]

The Petitioner goes on to complain that Mr. Mauro "did not significantly investigate

Mrs. Adams possible testimony…."[97]

First, Mr. Mauro directly contradicts this characterization of his efforts in exploring Ms.

Adams as a trial witness:

> Well, I interviewed Ms. Adams twice with an investigator. I don't --
> Ms. Adams wouldn't have added anything…. Ms. Adams basically
> -- I think Ms. Adams in some ways would have been harmful to Mr.
> Joseph because she would have testified that he never lived in that
> house, in the Red Trail house. I think they wanted me to call her to
> talk about her husband's drug addiction issues, which he admitted
> on cross-examination.… I didn't think that she would be a helpful
> witness. She might be helpful at sentencing, but I didn't think she
> would be helpful during the course of trial.

---

[95] Deposition of Richard Mauro on 09.18.2019, Transcript 22:22-25; 23:1-15.
[96] Petitioner's Motion at 10.
[97] *Id.* at 11.

> Q. And did you have a Mr. -- a conversation with Mr. Joseph about that?
> A. I did.
> Q. And what was his response?
> A. I think he understood. I mean, I told him the reasons why I didn't think she would be helpful….I mean, look, Ms. Adams clearly likes Mr. Joseph and his wife, Shannon. I mean, they're good friends and they are -- and I think Mrs. Adams and Mr. Adams are nice people. I really do.[98]

Mr. Mauro testified that he interviewed Ms. Adams twice with an investigator and made the assessment that she would actually be harmful to the case rather than helpful because she knew that Mr. Joseph never occupied Red Hawk as a primary residence (contrary to his representation on the loan application).

Moreover, the testimony Mr. Joseph claims that Ms. Adams would have offered at trial is either duplicative or excludable as hearsay. Mr. Adams admitted in front of the jury that he had memory issues related to his "addiction to pain medication"[99] Mr. Adams also testified that Mr. Joseph trusted him to "be honest," "not to misrepresent things," not to lie, and not to "conceal anything".[100] To the extent that Ms. Adams sought to testify as to things she heard Gabriel Joseph say to Mr. Adams about ensuring the transaction was legal, this would have been excludable as hearsay under Federal Rules of Evidence 801. However, Mr. Adams already testified that he and Mr. Joseph agreed to act honestly.

Starting with the strong presumption that Mr. Mauro was acted competently in these decisions, the Petitioner is light-years away from establishing unreasonableness or even deficient performance. Mr. Mauro was completely justified incorporating as part of an overall defense strategy, evidence seeking to undermine the materiality requirement of the wire fraud count (by

---

[98] Deposition of Richard Mauro on 09.18.2019, Transcript 38:11-25, 39:1-13.
[99] Trial date 10.28.2015, Transcript 150:20-25, 151:1-7.
[100] 153:10-23.

suggesting that WAMU's underwriting standards rendered any potential misrepresentations meaningless); or evidence identifying Shannon Spangler as a fraudster who had an incentive to fabricate items in Gabriel Joseph's loan application (which allowed Mr. Mauro to argue that Gabriel Joseph did not have specific intent to defraud even if there were inaccuracies in the materials submitted to the bank).  Again, these specific defenses were raised as part of a reasonable, robust, nine-tier strategy.  Nothing in Petitioner's Ground 2 can undermine confidence in the outcome of the trial.

### Ground 3: Trial Counsel "Refused" to Investigate or Present Mr. Joseph's Defense of Good Faith Reliance on the Advice of Legal Counsel.

As a threshold matter, it should be noted that counsel does not commit ordinary error or any type of error when counsel does not raise claims that do "not have a reasonable probability of succeeding."[101]  Also, "[p]rejudice cannot result from an attorney's failure to pursue a frivolous claim."[102]

Petitioner, in his Ground 3, complains that Mr. Mauro never investigated or presented a "good-faith reliance on the advice of legal counsel" defense.[103]  Specifically, Mr. Joseph claims he sought and obtained advice of counsel "before … the underlying real estate transactions for which [he] was convicted."[104]  He claims that he was advised that "the specific real estate transaction itself, was not illegal."  Mr. Joseph claims that Doug Matsumori of Ray Quinney & Nebeker ("RQN") gave him a "written opinion letter on the transaction at issue"[105]  Finally, he claims that Russell Skousen and Mr. Joseph's business partners, including now-convicted fraudster

---

[101] *Miller v. Keeney*, 882 F.2d 1428, 1435 (9th Cir. 1989).
[102] *Peila v. United States*, 2018 WL 6026823, at *3 (D. Utah Nov. 16, 2018)(Judge Nuffer)(unpublished) (quoting *United States v. Geraldo*, 271 F.3d 1112, 1116 (D.C. Cir. 2001)).
[103] Petitioner's Motion at 12.
[104] *Id.*
[105] *Id.* at 13.

Claud R. Koerber, can testify that Mr. Joseph sought and received legal advice on the transaction at issue.

The representations Petitioner makes to the Court regarding the purported advice of counsel defense are false and contradicted by every witness and every record obtained  in the United States' investigative discovery efforts.

Mr. Matsumori was interviewed by the US Attorney's Office and the FBI on October 3, 2019.[106]  The Red Hawk transaction was entirely concluded by February 23, 2007.[107]  Mr. Joseph was approached and interviewed by federal law enforcement on March 21, 2007, signaling to him that a criminal investigation was ongoing.[108]

However, Mr. Matsumori stated that Mr. Joseph hired him on March 29, 2007.  Mr. Joseph provided a $10,000 wire as a retainer.[109]    Mr. Matsumori did not recall ever speaking with Mr. Joseph before that day.  Mr. Matsumori did recall that Mr. Joseph retained him to review Mr. Joseph's past actions and assess Mr. Joseph's criminal exposure and civil liability.  This is consistent with the email correspondence provided to the United States by RQN between Mr. Joseph and Douglas Matsumori.  On March 28, 2007, Mr. Joseph writes to Mr. Matsumori that he would like him to represent him and provide him general counsel and advice on some real estate transactions.  Mr. Joseph states, "Lastly, but most important to me is if the attorney in Colorado can be hired to represent me ***in this investigation***."[110]  It is clear from this correspondence that by the time Mr. Joseph retained Mr. Matsumori, he had already finished the Red Hawk transaction without any legal advice from RQN, and was fully aware of the criminal investigation that was

---

[106] Government's Response Exhibit 01 (Interview of Douglas Matsumori).
[107] Government's Response Exhibit 02 (Trial Exhibits 2-38 and 2-39).
[108] Government's Response Exhibit 03 (Interview of Gabriel Joseph).
[109] Government's Response Exhibit 04 (RQN Retention Agreement).
[110] Government's Response Exhibit 05 (Email from Joseph to Matsumori 03.28.2007)(emphasis added).

underway.

Mr. Matsumori stated that he was retained to "look back" at what had already happened with Mr. Joseph.  Mr. Matsumori stated that all of the advice he gave Mr. Joseph was "retrospective" meaning that events had already occurred and RQN was just reviewing what had already happened in order to decide what to recommend that Mr. Joseph do next.  Mr. Matsumori also described Mr. Joseph as an uncooperative client from whom it was difficult to get documents and information.

RQN produced to the United States a series of notes hand-written by Mr. Matsumori and others outlining the representation of Mr. Joseph.  RQN retained Mr. Matsumori's notes from April 4, 2007 wherein it mentions a Park City property.[111]  Mr. Matsumori stated he would never have told Mr. Joseph or anyone else to claim money owed to others as an asset or income in a loan application.  Mr. Matsumori did not recall speaking with Mr. Joseph about buying the Red Hawk property through SCIPC and then selling it to Gabriel Joseph personally.  Mr. Matsumori stated that it would have been a "serious problem" if Mr. Joseph was on both ends of the Red Hawk transaction with a seller finance commitment (from himself) especially if the bank who lent the money to purchase the property was not aware of the situation.  Mr. Matsumori stated that it would have been important to the lender to know this and the context of the transaction.

Finally, Mr. Matsumori stated if he ever wrote a legal opinion letter to Mr. Joseph it would have been placed in and maintained in the RQN file.  The files were searched thoroughly and no opinion letter was found.  Mr. Matsumori confirmed he does not maintain any sort of personal copy of any RQN matters and does not remember ever drafting an opinion letter for Mr. Joseph.

It is crystal clear from the client file, the bank records, and Mr. Matsumori's memory that

---

[111] Government's Response Exhibit 06 (Douglas Matsumori notes of interview with Gabriel Joseph).

Mr. Joseph did not obtain advice from counsel before the Red Hawk transaction. Nor did Mr. Matsumori tell Mr. Joseph that the way he conducted the transaction was legal or that it was legal to provide false and misleading information to the bank.

Mr. Skousen represented Rick Koerber personally and the Franklin Squires company not Mr. Joseph personally.[112] As Mr. Mauro stated in his deposition, "Mr. Skousen, I'm not aware, had anything to do with any of the transactions involved in this case. Q. And is that why you decided you wouldn't call him? A. Right. Yeah."[113] Mr. Mauro also recalled that the discussions he had with Mr. Joseph about Mr. Skousen were "pretty limited" but he understood from those conversations that Mr. Skousen was "involved in the investment plan that was put together by Founders Capital and those folks."[114]

Mr. Mauro denied Mr. Joseph's claim that he "refused to investigate"[115] an advice of counsel defense.[116] Mr. Mauro explained that he was not aware of any document, any evidence, or any conversation he ever had with Mr. Joseph that would suggest Mr. Joseph had a viable advice of counsel defense.[117] In fact, Mr. Mauro confirmed that "there wasn't any consultation with lawyers on any of these transactions…"[118]

The documents and witnesses demonstrate that Mr. Joseph never consulted with an attorney on how to structure the Red Hawk transaction. The reality is, Mr. Joseph never disclosed to any attorney his fraudulent two-time purchase of the property, his fake seller financing scheme, or the full scope of the misrepresentations he fed to the bank to induce the loan. Mr. Mauro did

---

[112] Tom Harvey, THE SALT LAKE TRIBUNE, *Ex-Koerber attorneys: Feds erred in talks with alleged Ponzi schemer*, available at https://archive.sltrib.com/article.php?id=55363616&itype=cmsid.
[113] Deposition of Richard Mauro on 09.18.2019, Transcript 36:5-15.
[114] *Id*. at 36:12-15.
[115] Petitioner's Motion at 12.
[116] Deposition of Richard Mauro on 09.18.2019, Transcript 56:1-14.
[117] *Id*. at 54:24-25, 56:1-14.
[118] *Id*. at 42:22-23.

not act unreasonably or commit error in not pursuing a claim that had no reasonable probability of succeeding at trial.  The Sixth Amendment only requires counsel to make "a reasonable decision that makes particular investigations unnecessary."[119]  Likewise, prejudice cannot result from Mr. Mauro's refusal to pursue a frivolous claim.

### Ground 4: Trial Counsel Failed to Investigate or Present Other Legitimate Defenses at Trial.

Petitioner next complains that Mr. Mauro failed to investigate or present a "factual innocence" defense which could have been established by calling the following witnesses: Gabriel Joseph, Russell Skousen; Claud R. Koerber, and Doug Matsumori.  Responding in turn: Mr. Joseph chose not to testify.  Russell Skousen had nothing to do with the Red Hawk transaction.  Claud R. Koerber had been accused of running a massive Ponzi scheme at the time, though Mr. Mauro tried to arrange a meeting with Mr. Koerber, through Koerber's attorney Marcus Mumford, Mr. Koerber's attorney cancelled each proposed meeting.  Doug Matsumori has no memory or personal knowledge of Mr. Joseph's income or assets declared to the bank, nor does he remember assisting Mr. Joseph in setting up any companies or give advice on the Red Hawk transaction.  In short, none of these witnesses, other than Joseph, could have established a "factual innocence" defense. As outlined above, Mr. Mauro made a "factual innocence defense" without assuming the risks of putting on Mr. Joseph's testimony.  He was able to argue forcefully at closing that Mr. Joseph provided truthful information in his loan application and that the financial information that he provided was accurate.

In this section, Petitioner also claims that Mr. Mauro should have presented evidence that his conduct was consistent with legal "equity milling."  However, on the topic of "equity milling" Mr. Mauro explained:

---

[119] *Hanson v. Sherrod*, 797 F.3d 810, 830 (10th Cir. 2015)(internal citations omitted).

> I thought that utilizing additional sort of theories about equity milling would be confusing in some ways.
>
> ….
>
> I wanted to try to keep it clean. I thought that his best effort was to say that what he did wasn't illegal; that he provided truthful information; that the bank's underwriting policies and procedures would allow him to get the loan.
>
> ....
>
> I think equity milling would be in ways somewhat confusing to the jury in terms of what that is. And then I was also afraid it may open up the door to other transactions that would then, I suspect, be further confusing to the jury.[120]

The Petitioner has failed to establish a cognizable claim of failure-to-investigate under the *Strickland* standard because he has not alleged with specificity what additional investigation would have revealed and how it would have altered the outcome of the trial.[121]  Rather, Mr. Joseph makes conclusory assertions that are false.  This is insufficient to establish a Sixth Amendment denial of competent counsel.  Mr. Mauro acted reasonably in making all of these decisions and Mr. Joseph suffered no prejudice when Mr. Mauro did not call to testify a lawyer who did not represent Mr. Joseph and had nothing to do with the Red Hawk transaction (Skousen), a man who had been accused (and has since been convicted) of running a Ponzi scheme (Koerber), and a lawyer who Joseph contacted only after he had committed the fraud and who would have said the transaction had a "serious problem" (Matsumori)

### *Ground 5: Trial Counsel Failed to Investigate or Present Expert Accounting Testimony.*

The Petitioner next complains that Mr. Mauro was ineffective for not retaining a financial expert to contend with the summary exhibit preparation work done by Special Agent Ron Marker.  Specifically, the Petitioner claims that an expert would have been able to testify that as Mr. Joseph laundered the fraudulently obtained WAMU funds through his various accounts and CDs, the

---

[120] Deposition of Richard Mauro on 09.18.2019, Transcript 33:18-19, 50:3-7, 50:17-21.
[121] *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) (citation omitted).

funds were "commingled more and more with funds from other sources."[122]  While it is true that Special Agent Marker testified that the transfers could not have been made without the proceeds from the Red Hawk transaction, he never stated that the funds were not co-mingled.  It is also completely unclear (legally and factually) why such co-mingling could have altered the outcome of the trial in any way.  18 U.S.C. § 1957 requires only the transfer of $10,000 of fraudulent proceeds; the United States is not required to meticulously trace the funds or prove that only tainted funds were involved in the transaction.[123]  Here, Mr. Joseph transferred multiple millions of dollars of illegal loan proceeds at a time.  Special Agent Markers testimony was definitive that these multi-million dollar transfers were only possible because of the fraudulently obtained loan proceeds. The fact that the dirty money may have been commingled with other funds does not change that analysis or the outcome.

Mr. Mauro testified that he attempted to find an expert that could help with the case. Specifically, he spoke about the case with a Seattle firm; however, he was unsuccessful at finding anyone who would be helpful to the case. [124]  Mr. Mauro also attempted to recruit local experts in Utah from the real estate market to discuss the Red Hawk transaction and the mortgage processes generally both pre and post-2008, but he could not find anyone willing to assist.[125]  Mr. Mauro made reasonable efforts to locate experts, but much of this evidence was introduced at trial through

---

[122] Petitioner's Motion at 19.
[123] *United States v. Dazey*, 403 F.3d 1147, 1163 (10th Cir. 2005) (To prove a money laundering count "[t]he government need not meticulously trace the funds involved in a monetary transaction offense or prove that the funds could not have come from a legitimate source."); *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992) (requirement under § 1957 to show "that the proceeds were in fact 'derived from specified unlawful activity' could not have been intended as a requirement that the government prove that no 'untainted' funds were deposited along with the unlawful proceeds.  Such an interpretation would allow individuals to avoid prosecution simply by commingling legitimate funds with proceeds of crime.  This would defeat the very purpose of the money-laundering statutes." (citations omitted).  *United States v. Sivigliano*, 12-6247, 2013 WL 3958369, *3 (10th Cir. Aug. 2, 2013) (unpublished) ("in this circuit (as in some others), when legal and illegal funds are commingled in an account from which transfers are made, the government is not required to trace particular illegal funds to particular transfers to prove the use-of-unlawful-proceeds element of money laundering." (citing *Dazey* and *Johnson*)).
[124] Deposition of Richard Mauro on 09.18.2019, Transcript 16:18-25.
[125] *Id*. at 16:18-25, 17:1-9, 71:22-24.

cross-examination of the government's witnesses—especially Cecelia Sanudo.

Also in this section the Petitioner complains that Mr. Mauro failed to have an expert testify that Mr. Joseph made $225,000 of loan payments for "one and a half years"[126]  The United States proved at trial, through exhibit 4-3, that Mr. Joseph defaulted on his Red Hawk loan and ceased making payments from December 1, 2007 through March 1, 2008.  The United States proved through Exhibit 2-27, that Mr. Joseph agreed to pay at least for the first year of the mortgage, $15,750 per month.  Thus, the evidence at trial was that Mr. Joseph did not default on his loan for 10 months, and made payments of approximately $157,500.  The Petitioner gives no insight as to why evidence of an additional $67,500 in payments would make any difference to the outcome of the trial.  The jury understood that Mr. Joseph made payments for a time (at least 10 months) and they still rendered guilty verdicts on all counts.  The "skin in the game" arguments made by the United States all centered around Mr. Joseph's $1.5 million fake seller carry loan, not the fact that he defaulted on the mortgage.[127]  Mr. Mauro objected on the record to the entirety of any information relative to the default on the loans.[128]

Mr. Mauro's decision not to call an expert who would be helpful to the defense is sound trial strategy under *Stickland's* deferential standard because such testimony was duplicative, irrelevant, and had the possibility of raising negative consequences for the defense.  Mr. Joseph

---

[126] Petitioner's Motion at 18.

[127] Trial date 11.03.2015, Transcript 780:12-25 ("We talked about this seller carry loan. Again, that was something that Ms. Sanudo -- as I believe the testimony showed that the loan to value ratio was something that was very important to the bank, that they did not want to fully finance this, that the borrower had to have, for lack of a better word, some skin in the game, to have some equity at risk. So they put a condition that there had to be a certain level of loan to value ratios. So that was the basis on which they made the loan, that there was going to be some equity in the property, that Mr. Joseph put money on the table, when, in fact, that seller carry loan was completely fabricated. It made it look like there was equity in the transaction when there absolutely was none. Mr. Joseph didn't bring any money to the table."); 790:22-25 ("So he was required to bring $1.5 million to closing. That was put in place so he wouldn't walk away from the loan, so he would have skin in the game, so that he wouldn't lose that money if he walked away from the property.").

[128] Trial date 10.30.2015, Transcript 345:9-14 ("I would also make a 403 argument that the probative value is substantially outweighed by the unfair prejudice, confusing the jury, given that it is a wire fraud and a false statement case and they occurred at the time that those documents were submitted.").

certainly cannot show he was prejudiced in any way by not having experts establish the things he thinks they could have established.

### Ground 6: Trial Counsel Failed to Investigate or Defended Tax Charges.

Mr. Joseph next complains that Mr. Mauro failed to "adequately investigate or present any evidence whatsoever related to the tax count." Specifically, Mr. Joseph claims that Mr. Mauro should have pursued what amounts to an advice of counsel defense—i.e. that Mr. Joseph had received advice from tax attorney Joseph Thibodeau that he "don't do anything. Don't file. Don't contact the IRS. I'll handle everything."[129]

Mr. Thibodeau was interviewed by the US Attorney's Office and the FBI on September 25, 2019, over the phone.[130] Mr. Thibodeau stated definitively that he was hired on approximately April 3, 2007 *well after* Mr. Joseph completed the federal misdemeanor act of failing to file taxes for tax year 2005 (which would have been October 16, 2006). This is consistent with Gabriel Joseph's bank records that show a wire transfer of $50,000 from Annuit Coeptis to the Law Office of Joseph Thibodeau on April 4, 2007.[131] Mr. Thibodeau indicated that this $50,000 was a retainer, and he remembered refunding some of that to Mr. Joseph later. In addition, Mr. Thibodeau remembers specifically telling Mr. Joseph that he needed to file his taxes but that it was important that they be accurate so he needed a dependable tax accountant. Mr. Thibodeau stated he would *never* have instructed Mr. Joseph not to file taxes but that he was retained to do "damage control." In other words, Mr. Joseph had already committed the crime of failing to file taxes, Mr. Thibodeau was brought in to help him navigate that violation and try to make it right.

Mr. Mauro confirmed that he had a few conversations with Mr. Joseph about

---

[129] Petitioner's Motion at 20.
[130] Government's Reply Exhibit 07 (Interview of Joseph Thibodeau).
[131] Government's Reply Exhibit 08 ($50k Wire to Joseph Thibodeau).

Mr. Thibodeau and the fact that Mr. Thibodeau was helping on some of his tax issues but had no memory of Mr. Joseph telling him "multiple times" that Mr. Joseph was advised not to pay his taxes.[132]

At trial, Mr. Mauro effectively argued that Mr. Joseph did not have the "willful" intent to fail to pay his 2005 taxes.  He argued that Mr. Joseph paid a lot of money and went through extraordinary efforts to try to put together his tax documents and because he made such efforts, his failure to file was non-willful.[133]  Lack of intent was a sound strategy to pursue at trial.  Mr. Mauro was under no constitutional obligation to pursue an advice of counsel defense that was wholly deficient factually and legally.  Because the actual facts are the opposite of what Mr. Joseph represents in his motion, he cannot show prejudice.

### Ground 7: Trial Counsel Failed to Object to Jay Garlick's testimony.

Petitioner's Ground 7 falsely claims that witness Jay Garlick was allowed to testify, without defense objection, regarding a conversation he had with Mr. Joseph in which Mr. Joseph made admissions about having his wife Shandi lie about her income on a mortgage loan application.[134]  This is a blatant misrepresentation of the record, and the Petitioner seeks to mislead this Court.  Pretrial, Mr. Mauro filed a five-page objection to the introduction of this evidence.[135]  Moreover, during trial, before Jay Garlick took the stand, Mr. Mauro made the following objection:

> First of all, Your Honor, I would ask that any 404(b) witnesses be excluded for this reason: There is no loan application that it appears as though the government is going to be able to admit into this trial. By allowing those witnesses to then come in to talk about income, to talk about lying about income, talking about intent to live in the house would be very prejudicial and misleading to the jury because they're then going to try to stack their substantive case with the

---

[132] Deposition of Richard Mauro on 09.18.2019, Transcript 48:7.
[133] Trial date 11.03.2015, Transcript 845:4-22.
[134] Petitioner's 2255 Motion at 21 ("Garlick testified, without objection from Mr. Joseph's trial counsel, regarding hypothetical transactions that Garlick guessed might happen.").
[135] *U.S. v. Gabriel Joseph*, Case No. Case 2:15-cr-00103-JNP, ECF Docket No. 39.

404(b) evidence. I think that's improper and I would ask the Court to exclude all the 404(b) evidence and reconsider the issues in this case.[136]

Additionally, during the Jay Garlick testimony, Mr. Mauro made two objections, one to responsiveness and one to relevance of his testimony to the proceeding.[137]  The preservation of the defense's position on the record as to this point for direct appeal is undeniable.

The Petitioner also claims that cross-examination by Mr. Mauro was deficient because it did not establish that Mr. Joseph never conducted business with Jay Garlick.[138]  Mr. Garlick never testified that he did business with Mr. Joseph, only that they had conversations about the possibility of working together.[139]  Therefore, this fact was already before the jury; and thus, Mr. Mauro could not have been ineffective for failing to elicit this fact.   In truth, Mr. Mauro cross-examined and worked to impeach Mr. Garlick:

> Q Okay. Let's talk a little. Mr. Walz had asked you, you had some concerns about this; is that right?
>
> A Correct.
>
> Q Did you call the bank and express those concerns?
>
> A I didn't have access to the loan application.
>
> Q Oh, so you didn't see the loan application?
>
> A No.
>
> Q You don't have the loan application?

---

[136] Trial date 10.29.2015, Transcript 172:20-25, 173:1-6.

[137] Trial date 10.29.2015, Transcript 187:21-22 ("Your Honor, I object. This is nonresponsive."); *id*. at 189:15-17 ("Object. This is not relevant. What Mr. Joseph said is relevant. His concerns are not relevant to this proceeding.")

[138] Petitioner's 2255 Motion at 21 ("Mr. Joseph never entered a single real estate transaction, or conducted any other business with him, but this fact was never presented to the jury on cross-examination or in Mr. Joseph's case-in chief.").

[139] Trial date 10.29.2015, Transcript 186:14-16 ("In roughly 2004, 2005, Mr. Joseph moved into my neighborhood, and one day at church introduced himself and introduced himself as a real estate investor."); *id*. at 186:23-25; 187:1 ("We made use of the opportunity to get together and see if there was some sort of way that we could work together. I was an agent at the time. That seemed to make sense.").

A No.

Q You didn't see Mr. Joseph fill it out?

A No.

Q You didn't see Shandi Joseph fill it out?

A No, I did not.

Q You didn't see anything about that, did you?

A No.

Q You don't know if a loan application went to somebody?

A No.

Q You didn't follow up with the bank?

A All I know is what Gabe told me.

Q So you didn't do any follow-up at all, did you?

A No.

….

Q Did you call the real estate board?

A No.

Q Did you call the police?

A No.

Q Did you call the FBI?

A No.

Q They came to you, didn't they?

A They did.[140]

---

[140] Trial date 10.29.2015, Transcript 191:20-25, 192:1-15, 195:1-9.

The misrepresentation to the Court by the Petitioner that Mr. Mauro did not object to Mr. Garlick's testimony is egregious and is clearly and directly contradicted by the record.  There is nothing in the record to suggest that Mr. Mauro's handling of this issue created an actual prejudice to the defendant.  To the contrary, the evidence was only used by the government for the very limited purpose of establishing Mr. Joseph's knowledge that reported income is material to a bank's decision to lend.

Indeed, the suitability of Mr. Garlick's testimony before the jury and the lawfulness of the Court's decision to admit this evidence is something that Mr. Mauro suggested in his deposition was viable for direct appeal.

> I thought that there were a number of pretty viable issues in the case that were subject to appeal, mostly the result of many motions in limines that we had that we had filed, and the result of objections and arguments that we had made preserving issues mostly having to do with the admissibility of certain witness testimony, as you guys know, that I somewhat vehemently objected to having admitted in this trial, and I thought that those were some viable claims that should have been considered on appeal. So I told Josh [Ostler] that I would be available to assist him in identifying those issues and helping him work through those issues for the appeal.
> ….
> I mean, we fought very hard to try to keep out people like Jay Garlick.... And we objected pretty vigorously to the admission of those witnesses because we didn't think that they were relevant, and if they were relevant, we thought it was inadmissible character evidence and, of course, subject to 403. I don't know that any of those issues were raised on appeal.[141]

For whatever reason, the Petitioner did not raise this issue on direct appeal, but instead attacks Mr. Mauro's handling of the objections.  Starting with the strong presumption that Mr. Mauro was acted competently in seeking to exclude Mr. Garlick's testimony entirely, and preserving his objections, the Petitioner is unable to establish unreasonableness or even deficient

---

[141] Deposition of Richard Mauro on 09.18.2019, Transcript 9:10-21, 50:24-25, 51:1-7.

performance.  Mr. Mauro's approach in his objections was thorough and decisive.  The Petitioner does not propose how Mr. Mauro could have argued or objected any better than he did; and thus, cannot establish prejudice.

**Ground 8: Trial Counsel Failed to Object to the United States' closing argument Referencing Jay Garlick's testimony**.

Petitioner's Ground 8 claims that Mr. Mauro was ineffective by not objecting to AUSA Strain's characterization of Mr. Garlick's testimony in closing argument.  Mr. Garlick testified before the jury as follows:

Q And can you tell us how this topic came up?

A Again, it was needed to understand the program, to have an example. And in this particular case, it was Shandi.

Q So what did Mr. Joseph tell you?

A He told me that in order to purchase *a particular property*, his particular credit score was not good enough and that he needed to use his wife's, and we went into some detail about how that would work.

Q And what detail did you go into?

A He explained that using her credit score, he could get a stated income loan that would qualify her to purchase *a $1.6 million, roughly, property*.

Q Did you express any concerns about that?

A I did.

Q What did you say?

…

A My concern was that Shandi didn't have that income and that it wasn't an accurate statement of her capacity to purchase *that* home.

Q Did you express that concern to Mr. Joseph?

A Yes.

Q Did he respond?

A Not that I recall, directly to that.

Q Did you know Mrs. Joseph's, Shandi Joseph's situation relative to employment at that time?

A At that time she was expecting a child, she was late in that term, and that was part of my concern was that it didn't appear to me that she could make the income when she wasn't working.

Q Were there some amounts of income that were talked about that were going to be attributed to Mrs. Joseph?

A It was necessary -- *to purchase a $1.6 million home*, as I recall it was somewhere in the 20 to $25,000 range, on a monthly basis.[142]

Although Mr. Garlick has an interesting affect and circuitous way of expressing himself, it is clear from his testimony that Mr. Joseph and Mr. Garlick discussed a particular property as an example of how Mr. Joseph's "program" worked, and that Mr. Joseph sought to obtain a stated income loan by using his wife Shandi's credit, and lying about her income.  In describing their conversation Mr. Garlick testified: "It was necessary, under [Mr. Joseph's] explanation, that to purchase properties, *especially specifically one that we were using as an example at the time*."[143]  The Petitioner's characterization of this conversation in his 2255 motion as a "hypothetical only" is simply inaccurate.  Mr. Garlick never testified that this was a hypothetical conversation.  There was every indication from Mr. Garlick's testimony that this involved a specific example where Mr. Joseph was seeking to purchase a $1.6 million home through falsely representing his wife's income and using her credit.

Again, Petitioner could have raised these so-called "egregious" and "prejudicial

---

[142] Trial date 10.29.2015, Transcript 188:24-25; 189:1-13, 21-25; 190:1-14 (emphasis added).
[143] Trial date 10.29.2015, Transcript 187:16-20 (emphasis added).

misstatements" on direct appeal, but chose not to do so.  Moreover, it is impossible for Mr. Joseph

to argue that defense counsel's "failure" to object to this characterization caused prejudice—

especially where, as here, Mr. Mauro provided the jury with his own characterization of Mr.

Garlick's testimony:

> Well, great, Mr. Garlick, did they apply for a loan? Well, no, they
> didn't. Well, Mr. Garlick, you are posting anonymous things on an
> Internet blog about people. That's kind of odd, isn't it? It's kind of
> weird that he would do that. Well, did you ever see a loan
> application? No, it was in my car while I was driving. What does
> that all mean?
> ….
> When you don't have any way really of challenging it and you are a
> defendant on trial with your freedom at stake and some guy comes
> and says ten years later I remember this phone conversation about a
> loan that didn't exist, judge that evidence for what you will. I would
> suggest to you it's not very good evidence.[144]

Petitioner mischaracterizes both the prosecution's comments to the jury and Mr. Garlick's

actual testimony.  Petitioner has completely failed to brief the issue in the actual context of the

trial and has not demonstrated that Mr. Mauro acted unreasonably or that he suffered prejudice as

a result.

### Ground 9: Trial Counsel Failed to Request a Limiting Instruction Regarding Jay Garlick's Testimony.

Petitioner's Ground 9 claims trial counsel was ineffective for not requesting a limiting

instruction of Mr. Garlick's testimony.  At trial, Mr. Mauro specifically declined to request a

limiting instruction with regard to Mr. Garlick's testimony.[145]

Generally, "the decision not to request a limiting instruction is 'solidly within the

acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning

---

[144] Trial Date 11.03.2015, Transcript 822:7-13, 19-25.
[145] Trial Date 11.02.2015, Transcript 740:14-17 ("THE COURT: And then the last thing on my list is whether or not Mr. Mauro wants a limiting instruction on the Garlick testimony. MR. MAURO: No, Your Honor.").

evidence.'"[146]  In this case, Mr. Garlick's testimony occupied only a very minor portion of the five-day jury trial.  Moreover, the United States effectively gave Mr. Joseph the benefit of a limiting instruction by describing the specific purpose for which the evidence could be offered (i.e. Mr. Joseph's knowledge that income was material to Washington Mutual): "*This conversation is evidence that Gabriel Joseph knew that income was an important and material factor to Washington Mutual in making its decision to lend.*"[147]

Because the prosecution did not seek to use Mr. Garlick's testimony for any other purpose, and because Mr. Mauro was able to address Mr. Garlick's testimony in a powerful way during his closing (as outlined above), a limiting instruction was simply unnecessary.  Given these facts, Petitioner is far from proving that Mr. Mauro acted unreasonably or that the outcome of the trial would have been different with this instruction.

### Ground 10: Trial Counsel Failed to Request a Duty to Disclose Jury Instruction

Petitioner's Ground 10 claims trial counsel was ineffective for not requesting a "duty to disclose" jury instruction.  He fails to establish unreasonable error or prejudice.  As part of Ground 10, Petitioner argues: "The gravamen of the Government's case was that Mr. Joseph committed fraud by omission . . ."  This is false.  Gabriel Joseph committed fraud by actively lying and providing false information to the bank.  Here is just one of the many examples the prosecution outlined in its closing of the numerous affirmative false statements Mr. Joseph made to the bank:

> This is [Joseph's] handwriting. Joseph doesn't write 50 percent. He writes 100 percent because he knows that's what he needs to say to get this loan closed. And that's the number that goes on the CPA letterhead. That's the number that goes to the bank. Ms. Sanudo said had she known his wife owned 50 percent of Annuit Coeptis, that could have influenced her decision to underwrite the loan. That's all the materiality requirement -- that's all that's required for materiality.

---

[146] *Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009)(citing *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir.1996)).
[147] Trial Date 11.03.2015, Transcript 798:9-12 (emphasis added).

> This is direct evidence. This 100 percent right here in his handwriting, that is direct evidence of Gabriel Joseph making false statements to influence the bank.

The fact that Mr. Joseph sold the property to himself (i.e. the transaction was not arm's length) was not presented to the jury as an omission—it was argued as a scheme and artifice to defraud which requires no misrepresentations or omissions.[148]

The Petitioner cites Ninth Circuit case *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016) for the proposition that nondisclosure can only support a wire fraud charge where there is a duty that has been breached.  However, *Shields*, in its holding, limited such a rule where "an omissions theory of fraud is alleged."[149]  This limitation is consistent with the Tenth Circuit's controlling holding in *United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997): "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."[150] In further clarifying the *Cochran* decision, the Tenth Circuit adopted a lower court's analysis as follows:

> The spectrum that I see is, on one hand, an affirmative misrepresentation. At the other end of the spectrum is a mere non-disclosure, where there is no duty to disclose. That's the *Cochran* situation. And midway in between is an affirmative representation which becomes ambiguous or misleading in the absence of a disclosure of additional information. And that is the deceitful concealment of material facts.[151]

Thus, in a pure omissions case (*Cochran*), the prosecution must establish a duty to disclose, and in such a case, a defendant is entitled to a duty to disclose instruction.  However, if the prosecution is based on a scheme and artifice to defraud—no misrepresentations or omissions are necessary,

---

[148] *United States v. Cochran*, 109 F.3d 660, 664 (10th Cir. 1997) ("A scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential . . .").
[149] *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016).
[150] *Id*. at 665 (10th Cir.1997) (quoting Chiarella v. United States, 445 U.S. 222, 235 (1980)).
[151] *United States v. Sharp*, 749 F.3d 1267, 1281 (10th Cir. 2014).

and the defendant is not entitled to such an instruction.  Moreover, if the prosecution is based on affirmative misrepresentation(s) that mislead, such counts may stand without such a duty to disclose instruction.

Petitioner puts tremendous weight in the Eight Circuit case *United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012), suggesting that it establishes a rule applicable to all fraud cases that if the government does not allege the defendant is bound by a fiduciary or statutory duty to disclose material information to a victim, indictments must be dismissed.  Yet, in that case the government "repeatedly conceded that Steffen did not make any affirmative misrepresentations to the Bank."[152]

Mr. Joseph's prosecution was not a pure omissions case.  It involved both a scheme and artifice to defraud (requiring no misrepresentation or omission) as well as numerous affirmative misrepresentations and false statements to the bank.  Given the arguments made at closing, and the specific instructions given to the jury, there is no possibility that they convicted Mr. Joseph based solely on omissions.  Legally, Mr. Joseph was simply not entitled to this instruction.

And yet, despite this, Mr. Mauro offered to the jury during his closing, his own "duty to disclose" instruction without objection from the United States: "Why don't they [WAMU] say, hey, Mr. Joseph, we've got your bank records here, we see a bunch of these deposits and withdrawals, what are the withdrawals. Somehow they [the prosecution] say, well, he had some duty to report that. I would suggest to you no way."[153]

Because the argument is based on the false premise that this was a pure omissions case, the Petitioner fails to demonstrate how Mr. Mauro acted in a constitutionally ineffective way, and how that prejudiced the outcome of the trial.

---

[152] *United States v. Steffen*, 687 F.3d 1104, 1110 (8th Cir. 2012).
[153] Trial date 11.03.2015, Transcript 817,17-21.

***Ground 11: Trial Counsel Failed to Advocate for Mr. Joseph's Speedy Trial Rights.***

Petitioner's Ground 11 claims trial counsel was ineffective for failing to advocate for Mr. Joseph's speedy trial rights in two ways.  First, Petitioner claims Mr. Mauro did not argue at the lower court that a misdemeanor was "not serious" when the lower court was deciding whether to dismiss with or without prejudice.  This issue was raised on direct appeal and decided against the Mr. Joseph.  Second, Petitioner claims Mr. Mauro did not raise or investigate an additional speedy trial violation Petitioner now identifies for the very first time in his § 2255 motion.

As to the claim that Mr. Mauro did not argue that the misdemeanor charge was "not serious" in seeking dismissal with prejudice, Petitioner suggests "On appeal, the Tenth Circuit acknowledged that this was a legitimate argument but concluded that it had been waived by trial counsel."[154]  This is a false characterization of the ruling.  In considering this argument specifically, the Tenth Circuit noted, "Joseph has failed to present a single case stating that the district court must consider the misdemeanor and felony offenses separately and regard all misdemeanor offenses as not serious."[155]  There is also no indication that if Mr. Mauro had suggested to Judge Shelby that the misdemeanor case should be considered separately and should be regarded as "not serious" that Judge Shelby would have been receptive to this novel, and legally unsupported argument.  Accordingly, Mr. Mauro did not act unreasonably, and the Petitioner can show no prejudice.

As to the second claim in Ground 11, Petitioner fabricates a rule not found in the Speedy Trial Act, and suggests that Mr. Mauro was ineffective for not advocating that the speedy trial clock began running upon re-indictment (not the initial appearance).

A plain reading of the statute eviscerates the Petitioner's argument.  Subsection (d)(1) of

---

[154] Petitioner's Motion at 26.
[155] *U.S. v. Gabriel Seth Joseph*, Appellate Case No. 16-4109, Order and Judgment at 17.

the Speedy Trial Act states that when an "indictment …is dismissed upon the motion of the defendant [and] an…indictment is filed charging such defendant with the same offense…the provisions of subsections (b) and (c) of this section shall be applicable…" Subsection (b) does not apply because it governs when an indictment must be filed after an arrest or summons. Subsection (c) requires that a trial, after new indictment, must commence within 70 days from the filing of the indictment or when a defendant appears, ***whichever is later***.[156]   In this case, the indictment was filed on February 25, 2015.  Mr. Joseph did not appear for his initial appearance until April 6, 2015 because he missed the setting for his first appearance on March 26, 2015.  Thus, according to a plain reading of the speedy trial statute, the speedy trial clock would have begun running on April 6, 2015.[157]

However, even if one accepts the Petitioner's unwarranted reading of the Speedy Trial Act, there remains no violation.  Before Mr. Joseph ever appeared in Court, the United States filed two motions in limine—one to admit business records and one seeking the exclusion of victim negligence evidence.  These motions in limine were filed on March 26, 2015.  The Court did not rule on the victim negligence motion until September 22, 2015; and by then there were a number of open motions in limine before the Court.  Trial commenced October 27, 2015.  These motions in limine automatically tolled the speedy trial clock.[158]

---

[156] Emphasis added.

[157] Mr. Joseph's friend, convicted fraudster Claud R. Koerber, advanced the same argument at the district court level in his case, proposing that the speedy trial clock runs from the date of re-indictment rather than the initial appearance.  In Koerber's case, in dicta, Judge Shelby noted, "The court is not persuaded that Koerber is correct that the clock begins when the Indictment was returned, rather than when he first appeared, but it declines to decide the issue...."  *See United Stastes v. Claud R. Koerber*, 2:17-cr-00037 RJS PMW, ECF No. 140 at 33.

[158] *See* 18 U.S.C. § 3161(h)(1)(D) ("The following periods of delay shall be excluded in computing the time within which ... the trial ... must commence: ... delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion ..."); *United States v. Young*, 45 F.3d 1405, 1411 (10th Cir. 1995) ("As we pointed out in *United States v. Tranakos*, 911 F.2d 1422, 1426 (10th Cir.1990), the exclusions in § 3161(h) are automatic, so no inquiry into the "true cause" of a delay is proper. We further noted that *Henderson v. United States*, 476 U.S. 321 (1986) makes clear that the entire time from the filing of a motion through the hearing on the motion is excludable under subsection (h)(1)(F). *See Tranakos*, 911 F.2d at 1426."); *see also United States v. Felton*, 811 F.2d 190, 196–97 (3d Cir.1987); *United States v. Lewis*, 824 F. Supp.

As for constitutional ineffectiveness, the Petitioner cannot argue that there is any probability that if Mr. Mauro had made a Speedy Trial Act Motion to dismiss based upon this new theory, unsupported by the statute, that he would have prevailed at getting the case dismissed with prejudice.  Even if there were a Speedy Trial Act violation, which there was not, Mr. Joseph could not show a reasonable probability that, but for his counsel's alleged error, the result of the proceedings would have been different.[159]  Though a violation of 18 U.S.C. § 3161(b) requires dismissal of the indictment, a district court is given "great discretion" whether to dismiss with or without prejudice.[160]  Mr. Joseph offers nothing to indicate his indictment would have been dismissed with prejudice, especially given the factors to be considered in making that determination.[161]

The record is definitive that all of the delay after Mr. Joseph was re-indicted is entirely, , attributable to him.  In fact, at the initial appearance on April 6, 2015, AUSA Strain requested a trial date 31 days from that date: "Your Honor, can I make a request to the Court? …. [G]iven the case history the government's requesting that jury trial be set 31 days from today's date, which is May 7th, 2015."[162]  Defense counsel quickly and thoroughly spelled out all the reasons why this trial setting would be impossible for him.  All the delays that followed were sought by Mr. Joseph.  Mr. Joseph was also found to be mainly responsible for the delay in the dismissal of the first

---

2d 169, 173 (D.D.C. 2011); *United States v. Ream*, 2011 WL 1989796, at *6 (D. Utah May 23, 2011) (unpublished) ("Defendant is advised that every pretrial motion he files automatically tolls the time under the Speedy Trial Act, 18 USC § 3161(h)(d) until the Motion can be decided."); *United States v. Suggs*, 378 F. Supp. 3d 962, 967–68 (D. Colo. 2019) (unpublished).

[159] *See Strickland v. Washington,* 466 U.S. 668, 694 (1984)).

[160] 18 U.S.C. § 3162(a)(1).

[161] 18 U.S.C. § 3162(a)(1). In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, a court balances four factors: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of his right; and (4) any prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530 (1972); *United States v. Lugo,* 170 F.3d 996, 1002 (10th Cir.1999).

[162] *U.S. v. Gabriel Seth Joseph*, Case No. 2:15CR103, Hearing date April 6, 2015, at 11:39:00am through 11:40:00am.

indictment.[163]  Because Mr. Joseph cannot show that the Court would have dismissed his case with prejudice and because he cannot show the result of the proceedings would have been different (and thus that he suffered prejudice), his ineffective assistance of counsel claim must fail.

## V.    AN EVIDENTIARY HEARING SHOULD BE CONDUCTED

Although the record and the evidence collected in discovery disproves all of the Petitioner's factual claims, the prudent course would be for the Court to hold an evidentiary hearing.  In a § 2255 proceeding, a district court is not required to grant an evidentiary hearing on a defendant's claims where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[164]   Additionally, no hearing is required where petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."[165]   Conclusory and unsupported allegations do not require a hearing.[166]  A district courts refusal to hold an evidentiary hearing is reviewed by the abuse of discretion standard.[167]   In reviewing a Petitioner's 2255 motion and determining the propriety of a hearing, the grounds raised should be "construed liberally."[168]

The United States has thoroughly reviewed the files and records of this case in light of the grounds alleged by Mr. Joseph.   The records and the evidence obtained in discovery all conclusively contradict Mr. Joseph's claims.  However, the prudent course for the Court would be to conduct an evidentiary hearing.[169]

---

[163] *U.S. v. Gabriel Seth Joseph*, Case No. 2:11-cr-072, hearing on Motion to Dismiss before District Court Judge Robert Shelby, November 5, 2014, at p.40 ("In this case I conclude that the delays should be attributed primarily to Mr. Joseph.").
[164] 28 U.S.C. § 2255(b); Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts; *see also United States v. Lopez*, 100 F.3d 113, 110 (10th Cir.1996); *United States v. Marr*, 856 F.2d 1471, 1472 (10th Cir.1988).
[165] *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir.1995).
[166] *See Eskridge v. United States*, 443 F.2d 440, 443 (10th Cir.1971).
[167] *United States v. Moya*, 676 F.3d 1211, 1214 (10th Cir. 2012).
[168] *United States v. Herring*, 935 F.3d 1102, 1111 (10th Cir. 2019).
[169] *See* id. (reversing Judge Stewart for failing to hold an evidentiary hearing).

## VI.  PETITIONER WAS CONVICTED BY AN OVERWHELMING WEIGHT OF EVIDENCE

Given the weight of evidence that was amassed against Mr. Joseph at trial, he cannot establish prejudice for any of the alleged errors he cites.  First, with respect to the wire fraud counts, the evidence established a scheme and artifice to defraud that started when Mr. Joseph had his friend, Brandon Adams, become the manager of SCIPC, and they used SCIPC to purchase a home for $3.4 million and got a hard money loan to do that.  Right after that, five days later, the evidence showed that Mr. Adams, at Mr. Joseph's direction, signed a real estate purchase contract in an effort to sell that property to Mr. Joseph for $7 million.  And then they went and shopped a loan for $7 million for property that Mr. Joseph already effectively owned through SCIPC. Ms. Sanudo testified if Mr. Joseph already owned the property, there was no need for the loan.

Another part of the scheme was that Mr. Joseph provided false information and gave a false impression to the bank about the fact this was an arm's-length transaction. When the bank asked whether there was a relationship between SCIPC and Founders Capital that they had seen in the records, Mr. Joseph had his friend, Forrest Allen, provide false information that they were not related when, in fact, they were.  The money from the loan actually ended up the Founders Capital account.

When the bank wanted to know whether Mr. Joseph had money in a Founders Capital account, that letter was provided. Mr. David Kirby signed a letter that was prepared that showed Mr. Joseph had $2.8 million in a Founders Capital account, but what he didn't disclose at the same time was that that money was obligated to other people. That money was largely borrowed money. But he gave the impression to the bank that he had that liquidity.  The same was true with the Utah Community Credit Union records. They showed a balance, but what they did not show was the amount that Mr. Joseph owed and that he was paying his borrowers significant amounts of money.

When the bank wanted to know whether Red Hawk was going to be Mr. Joseph's primary residence, he signed an affidavit at closing that said, yes, it was. It was going to be his primary residence. Yet the evidence showed he never moved in. He continued to pay the power at his old house and continued to live in his old house in Cedars Hills or Pleasant Grove, for the entire time period.

Ms. Sanudo testified that the loan to value ratio was something that was very important to the bank, that they did not want to fully finance Red Hawk. So that was the basis on which WAMU made the loan, that there was going to be some equity in the property, that Mr. Joseph put money on the table in the form of a seller carry loan. Because this was not an arms-length transaction, the seller carry loan was completely fabricated. Mr. Joseph made it look like there was equity in the transaction when there absolutely was none. Mr. Joseph didn't bring any money to the table.

Mr. Joseph stated on several occasions that he made $160,000 a month. On the Red Hawk loan application he represented $172,000 per month of income. An analysis of Mr. Joseph's bank accounts demonstrated that he never had that much money in a month available to him. His income from Founders Capital, subtracting out the interest payments he owed to people, never amounted to that figure.

The evidence established at trial overwhelmingly pointed to the defendant's guilt. The jury agreed and convicted Mr. Joseph on all counts. Mr. Mauro did an exceptional job with the limited hand he was dealt and pursued all of the most viable defenses.

## VII.  CONCLUSION

For the reasons set forth above, including the Petitioner's numerous misstatements of the facts on record and the conclusory, unsupported, and now disproved claims, the Court should reject the Petitioner's claims of ineffective assistance and deny and dismiss the 2255 motion after an evidentiary hearing.

RESPECTFULLY SUBMITTED this 17th day of October, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Jacob J. Strain*
TYLER L. MURRAY
JACOB J. STRAIN
Assistant United States Attorney