FD-302 (Rev. 5-8-10)



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

# FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/03/2019

    DOUGLAS MATSUMORI was interviewed at the Law office of RAY QUINNEY AND NEBEKER (RQN), 36 South State Street, Suite 1400. Also present during the entire interview was Paul Burke, Attorney, RQN. After being advised of the identity of the interviewing Agent and Assistant United States Attorney Jacob Strain and the nature of the interview, MATSUMORI provided the following information:

    [It should be noted that prior to this interview the office of RQN was requested to provide documents related to their representation of GABRIEL JOSEPH and ANNUIT COEPTIS. Those records were provided and MATSUMORI had an opportunity to review the documents.]

    MATSUMORI worked at RQN during 2007. The RQN office counseled RICK KOERBER regarding FRANKLINSQUIRES at that time as well as before and after.

    Even though MATSUMORI read through the above described documents they did not refresh his recollection much. This representation was many years ago and did not stand out in MATSUMORI's mind much. Almost all of MATSUMORI's memories of the situation were limited to what he had read in the file.

    MATSUMORI was shown a copy of a February 29, 2008, letter wherein RQN withdrew their representation of JOSEPH and ANNUIT COEPTIS. MATSUMORI did not believe that any other such letter would have been sent at any time. He usually kept everything he did and the records would have been kept in the file. MATSUMORI believed that the timing (2007) was correct for this work.

    Other records appeared to indicate that RQN was retained by JOSEPH and ANNUIT COEPTIS on about March 29, 2007. There was a wire transfer record showing a $10,000 transfer from JOSEPH to RQN. MATSUMORI believed these records to be accurate. He could not recall any conversations with JOSEPH prior to that time frame, however, MATSUMORI noted that JOSEPH was

| Investigation on | 10/03/2019 | at | Salt Lake City, Utah, United States (In Person) |
|---|---|---|---|

| File # | 318B-SU-63343 | Date drafted | 10/03/2019 |
|---|---|---|---|

by    Jeffrey T. Cannon

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

associated somehow with FRANKLINSQUIRES, whom MATSUMORI and RQN represented already at that time. MATSUMORI could not recall whether or not JOSEPH may or may not have attended any earlier meetings with KOERBER, but they likely would have dealt only with FRANKLINSQUIRES matters.

After reading through an e-mail about investors, MATSUMORI recalled that JOSEPH's case at RQN involved reviewing past actions and attempting to determine possible exposure. It was an effort in looking back at what had already happened to JOSEPH. This may have been in connection with issues JOSEPH had with the State of Utah at that time.

JOSEPH was not very cooperative. MATSUMORI asked for information, documents and records from JOSEPH but they were very slow in coming and MATSUMORI could not get all the information he wanted from JOSEPH. There were likely three other attorneys at RQN who assisted with the representation of JOSEPH. BRUCE OLSON handled tax matters, MARK PUGSLEY handled securities matters and GARY WINGER also handled securities matters. MATSUMORI mostly turned JOSEPH over to these individuals since MATSUMORI was more of a "client finder" regarding the JOSEPH case. MATSUMORI worked mostly on tax and securities matters. MATSUMORI believed that a piece of counsel JOSEPH would have been given was that if he had not given disclosures that he should go back and do so.

All of the advice that RQN and MATSUMORI gave JOSEPH was retrospective. Meaning that events had already occurred and RQN was just reviewing what had already happened in order to decide what to recommend that JOSEPH do next. There had been many discussions with FRANKLINSQUIRES (mostly with KOERBER) but MATSUMORI believed that there had not been any discussions about JOSEPH or ANNUIT COEPTIS until right around the end of March 2007 when RQN was retained.

MATSUMORI was shown a page of handwritten notes dated April 4, 2007. MATSUMORI recognized the handwriting as his. The notes mentioned a Park City property which they discussed during this meeting. MATSUMORI did not recall ever having looked at JOSEPH's loan application to purchase that property. After viewing the application during instant interview it did not look familiar to MATSUMORI but it was possible that he may have seen it. This application was for a loan to purchase a property known as the Red Hawk property in Park City, Utah. MATSUMORI did not recall anything about this

transaction. MATSUMORI did not believe that he had ever heard of the phrase "Shandi's Cabin in Park City", although the name SHANDI sounded familiar possibly as JOSEPH's wife.

JOSEPH told MATSUMORI that ANNUIT COEPTIS was his own business but MATSUMORI understood that it was a family business so he may have believed it to also be owned by JOSEPH's wife.

With regard to the loan application for this property, MATSUMORI would never have told JOSEPH or anyone else to claim money owed to others as an asset or income.

MATSUMORI did not recall speaking with JOSEPH about buying this property through SCIPC or SCIPC selling it to JOSEPH personally. MATSUMORI did not recall the name SCIPC at all. MATSUMORI did not think anyone at RQN helped JOSEPH set up any companies at all.

MATSUMORI did not know if JOSEPH was in default on this particular loan when he came to RQN for legal advice (at the time of the retainer). MATSUMORI recalled, however, that much later, through other documents in the file, MATSUMORI came to know that JOSEPH was in serious financial trouble.

If MATSUMORI ever wrote an opinion it would have been placed in and maintained in the RQN file. MATSUMORI did not maintain any sort of personal copy of any RQN matters with regard to JOSEPH. Likewise, MATSUMORI thought that he would not have any e-mails or texts or the like related to this matter other than what RQN possessed and provided.

MATSUMORI did not know how JOSEPH obtained an appraisal for this Red Hawk property. MATSUMORI did not know who BRANDON ADAMS was. In one communication shown to MATSUMORI there was an indication that JOSEPH would seek a $1.5 million loan from PORTIA (not further identified). MATSUMORI did not know anyone named PORTIA.

Regarding notes about SCIPC helping to finance the sale to JOSEPH of the Red Hawk property and carrying a 20% financing, MATSUMORI did not recall if JOSEPH was part of SCIPC. It would, however, have been a serious problem is JOSEPH was on both ends of the transaction with a 20% financing by the seller (himself) especially if the bank who lent the money to purchase the property was not aware of the situation. It would have been important to

the lender to know this and the context of the transaction. MATSUMORI thought that throughout this process he was continuously trying to get additional information from JOSEPH but it was very difficult.

MATSUMORI recalled discussing the "Equity Mill" with someone but he did not recall with whom. Mostly, he spoke with RICK KOERBER about FRANKLINSQUIRES matters such as this. MATSUMORI did not know if the Red Hawk property was part of the Equity Mill.

Handwritten notes dated March 27, 2007, were shown to MATSUMORI. MATSUMORI acknowledged that the handwriting was his. These notes referred to tax matters. MATSUMORI recalled that when OLSON reviewed the tax issues he felt that the matter was over his head and he referred JOSEPH to an attorney in Denver. When asked if this could have been JOE THIBODEAU, MATSUMORI said yes.

Handwritten notes dated April 3, 2007 were not written by MATSUMORI. The information was similar to notes MATSUMORI took on the following day (April 4th), so MATSUMORI wondered if maybe the date on these notes or his notes may have been slightly wrong or that perhaps it was another meeting or telephone call. MATSUMORI did not know who's handwriting this was.

MATSUMORI was shown an e-mail related to a possible conflict of interest matter with JOSEPH. MATSUMORI could not specifically recall but he assumed that a waiver was obtained. He said it seemed like the e-mail chain was taking a long time and responses were very slow from KOERBER. MATSUMORI could not recall what happened with regard to this issue.

MATSUMORI recalled receiving several e-mails from angry investors of FRANKLINSQUIRES.

MATSUMORI acknowledged an e-mail referring JOSEPH to PUGSLEY and WINGER.

In an e-mail dated April 2, 2007, from JOSEPH, JOSEPH asked MATSUMORI if he could run a couple of things by him. MATSUMORI thought that perhaps this was what triggered the April 3rd or 4th meeting(s) with JOSEPH.

An e-mail dated April 18, 2007, indicated that MATSUMORI opened about four RQN files for JOSEPH. MATSUMORI explained that at the time he thought

this might turn into a long-term relationship with JOSEPH so he decided to open a tax file, a securities file, a real estate file and a general file in order to manage all the communications and keep them organized.

An e-mail dated April 13, 2007, from MATSUMORI to JOSEPH related to a construction loan scenario and an application for a person named KIRBY (not further identified) and a possible $72,000 a month income. MATSUMORI did not know who KIRBY was. Apparently MATSUMORI reviewed the application and advised JOSEPH that KIRBY could not claim that money as income. JOSEPH responded that he would cancel the loan since KIRBY was not getting that amount of money per month from ANNUIT COEPTIS. MATSUMORI did not recall much else about this transaction.

MATSUMORI felt that JOSEPH was probably in very deep trouble, but it took time for MATSUMORI and others at RQN to realize how deep his problems really were, probably due to the difficulty in getting information from JOSEPH.

MATSUMORI and JOSEPH may have spoken about JOSEPH living in the cabin in Park City - that seems to ring a bell, but MATSUMORI could not recall whether this would have been JOSEPH's primary residence or a second residence or what.

Overall, MATSUMORI recalled JOSEPH as a nice person.