

FEDERAL BUREAU OF INVESTIGATION

Date of entry   09/26/2019

    JOSEPH H. THIBODEAU, Attorney, 155 South Madison Street, Suite 209, Denver, Colorado 80209, was interviewed by telephone at his office number (303) 320-1250.  After being advised of the identity of the interviewing Agent and the nature of the interview, as well as others participating, Assistant U.S. Attorney (AUSA) Jacob Strain and AUSA Tyler Murray, THIBODEAU provided the following information:

    THIBODEAU asked about the status of the case against GABRIEL JOSEPH.  AUSA Strain advised that JOSEPH had been charged with federal violations such as bank fraud, false statement to a bank, money laundering, fraud by wire, and failure to file a tax return.  JOSEPH went to trial in 2015 and was convicted.  He was sentenced in 2016 and had served about half of his sentence.  JOSEPH recently filed an ineffective assistance at counsel 2255 motion and had specifically indicated that one of the reasons was that his attorney had not contacted THIBODEAU nor called him as a witness at trial.

    THIBODEAU provided his background as an attorney.  THIBODEAU had been in practice for about 53 years.  THIBODEAU worked as an intern at the U.S. Department of Justice (DOJ) in 1965 and then worked as a trial attorney for DOJ from about 1966 to 1969.  THIBODEAU also worked at the University of Detroit law school and for the State of Michigan briefly.  THIBODEAU spent some time on the east coast for a couple of years and then moved to Denver where he worked in a small firm then a larger firm and in about 1979 he opened his own practice.  THIBODEAU also spent some time as an adjunct professor in Colorado to the graduate tax program.  [Interviewer's note: This may not all be listed in chronological order.]

    THIBODEAU's practice had been primarily associated with civil and criminal tax litigation, with some aircraft certification matters occasionally.  Typically, THIBODEAU dealt with indviduals and companies at the stage after an audit had been conducted by the IRS.

| Investigation on | 09/25/2019 | at | Provo, Utah, United States (Phone) |
|---|---|---|---|

File #  318B-SU-63343               Date drafted  09/25/2019

by  Jeffrey T. Cannon

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Currently THIBODEAU had no clients in Utah. JOSEPH may have actually been his last Utah client. THIBODEAU did not like to travel as much as he used to travel in the earlier days of his career.

THIBODEAU first dealt with JOSEPH in about April 2007. There was a flurry of activity in mid 2007 and maybe again in about 2010 or 2011 when the government began to be more interested in JOSEPH. This contact with JOSEPH was a long time ago and THIBODEUA's office had since (about one year ago) purged most of the physical records relating to the JOSEPH matter. He did maintain, however, a small number of "templates" which were not signed which showed the direction of his dealings with JOSEPH but not communications with JOSEPH. THIBODEAU referred to some of these documents throughout the interview and advised that he would forward copies of those documents including a retainer type letter dated around April 3, 2007.

The contact with JOSEPH seemed to begin with many civil summonses. THIBODEAU believed that what he may have been doing at that time was sending out letters to various recipients of these summonses and requesting that they provide a copy of the same records they produced for the government to be sent to THIBODEAU for his use in advising JOSEPH.

THIBODEAU could not immediately recall whether he traveled to Utah to meet with JOSEPH or if JOSEPH traveled to Colorado. Most communications, however, were by telephone. There was very limited contact with JOSEPH. He came in around April 2007 and by April 2011 THIBODEAU's office had disengaged with JOSEPH. The lion's share of the work THIBODEAU did was in 2007 and then it fell off dramatically until about 2011 when the government started expressing more interest in JOSEPH. At one point, AUSA Stew Walz had called THIBODEAU to see if he still represented JOSEPH but THIBODEAU did not represent him at that time.

Likewise, THIBODEAU could not recall exactly how JOSEPH and he became acquainted. He believed that it could possibly have been a referral from a Salt Lake City based attorney with whom THIBODEAU had dealings. During that time, THIBODEAU worked with high profile attorneys such as MAX WHEELER, NEIL KAPLAN, and others. THIBODEAU believed that JOSEPH may have been motivated by his association with a colegue who was under fire at the time by the name of RICK (last name not provided by THIBODEAU). RICK was a high profile target of the government and JOSEPH was connected closely enough that he

felt he might want to know beforehand what exposure he himself might face.

THIBODEAU recalled speaking to a couple of DOJ attorneys about this matter a couple of years into it. For some reason the case was forwarded to the U.S. Attorney's Office in Salt Lake City without THIBODEAU being notified and without having a chance to conference over the matter. At that time it seemed that the DOJ was focusing on the failure to file a tax return matter. It may have been the flurry of summons activity that motivated JOSEPH to seek counsel. THIBODEAU explained that this would likely have been the matter of concern by JOSEPH since THIBODEAU had only done criminal tax cases before with the exception of a single criminal aviation case. It definitely would have been for the tax issue.

AUSA Strain read from a memo written by IRS-CI Special Agent Ron Marker about a 2007 summons and a corresponding contact with THIBODEAU. Thereater, THIBODEAU indicated that the information sounded familiar. It was at that moment of the interview that THIBODEAU located an engagement letter (unsigned) template giving the date of April 3, 2007. Another Agent Marker report referred to VINCE LAYNE. THIBODEAU explained that LAYNE was of counsel to THIBODEAU's office and was now a retired IRS Special Agent.

AUSA Strain then read from another memo written by Agent Marker dated June 26, 2007, regarding a telephone call from THIBODEAU and LAYNE regarding a summons to LEWIS HENRY of TAX WIZARDS. The memo indicated that THIBODEAU wanted to quash the summons since he felt that Agent Marker had violated the notice waiting period.

THIBODEAU advised that this conversation also sounded very familiar to him as it seemed to ring a bell with him. He believed that this was likely fairly early on in the process of his dealings with JOSEPH. THIBODEAU recalled sending a letter to HENRY at TAX WIZARDS and THIBODEAU would have objected to taking records prior to the gestation period. THIBODEAU did not know HENRY and he thought that JOSEPH did not have much to do with him either because it seemed that HENRY had done work as a "one off contact", meaning it may not have dealt directly with JOSEPH.

THIBODEAU did contact another firm to do some pro forma returns in an attempt to see where things were at. It may have been with a guy by the name of (first name unknown) ROBINSON and/or a guy with last name starting

with a B like BRADFORD. This company may have been in Las Vegas, Nevada. THIBODEAU thought that JOSEPH may have given him the name of this tax preparer and THIBODEAU reached out to him.

AUSA Strain advised that ROBINSON had testified at JOSEPH's trial by saying that he had prepared JOSEPH's 2005 tax return in August 2006 and reminded JOSEPH that he needed to file in October.

THIBODEAU recalled that while he was communicating with the DOJ they were getting ready to meet with the DOJ so THIBODEAU talked to JOSEPH about getting a return done so it may not have been the 2005 return. The plan at the time was that JOSEPH was supposed to be working on his taxes in about 2010 when the DOJ drew a bead on JOSEPH.

THIBODEAU wanted JOSEPH to give him a compliance history so JOSEPH went to someone for early 2000s or before, then later had not filed the taxes. THIBODEAU and JOSEPH agreed that they needed someone who could complete the taxes correctly. THIBODEAU sent out a Kovel letter to either ROBINSON or BRADFORD or whoever that company was.

THIBODEAU did not recall ever specifically asking JOSEPH why he had not filed his taxes but they did talk about some not being filed. THIBODEAU told JOSEPH that they needed to be filed but that it was also important that they be accurate so they needed to find a dependable tax guy. It seemed like this never ended up going anywhere. THIBODEAU could not recall ever getting returns or filing anything for JOSEPH. They did not go to HENRY due to a falling out JOSEPH had with HENRY. It was JOSEPH who came up with the tax man in Las Vegas (THIBODEAU believed this was where the tax man was located but he admitted he was not certain).

Regarding JOSEPH's allegations that his trial counsel was ineffective, in the motion JOSEPH indicated that he could not figure his taxes on his own. THIBODEAU agreed with the fact that JOSEPH likely could not have done the work without professional assistance. Neither THIBODEAU nor anyone at his law firm prepared taxes for clients. They usually got involved in cases only after the fact that taxes were either not filed or were filed incorrectly. THIBODEAU never told JOSEPH that coming to THIBODEAU would exonerate him from having to file his taxes. THIBODEAU might tell a client that not filing might expose one to civil or criminal penalties and that

going back and paying the taxes would not eliminate those penalties. He also told JOSEPH that the taxes needed to be filed and that they should be correct because filing a false tax return was a serious problem.

AUSA Strain mentioned that JOSEPH claimed that he paid a $75,000 retainer to his tax attorney, after which the attorney demanded another $100,000 in order to give JOSEPH the returns and that when JOSEPH did not have the money the attorney dropped him.

THIBODEAU indicated that none of that sounded right. He wondered if maybe this might have been another attorney.

AUSA Strain advised THIBODEAU of certain bank records which seemed to indicate that JOSEPH had paid $50,000 from ANNUIT COEPTIS to the law office of THIBODEAU via wire transfer from Utah Community Credit Union (UCCU) on April 4, 2007. Later there was another check on May 9, 2007, in the amount of $15,760.34. THIBODEAU stated that this sounded correct and matched their records but that the check was actually a refund from THIBODEAU to JOSEPH because JOSEPH had requested the money be returned due to another need. There were no other payments from JOSEPH after this occasion. THIBODEAU, however, returned more money to JOSEPH following this transaction.

The information about an additional $100,000 did not sound right at all. THIBODEAU was not representing JOSEPH at the time JOSEPH was charged criminally. THIBODEAU represented JOSEPH through a local counsel, BRUCE OLSON of Ray Quinney Nebeker. OLSON moved for admission of a motion from THIBODEAU. THIBODEAU did not think that he had ever entered an appearance on JOSEPH's criminal matter.

AUSA Murray asked about a possible "Advice of Counsel" defense by JOSEPH. THIBODEAU indicated that he was not in a position to counsel JOSEPH on that matter since it was about one year after JOSEPH already missed the deadline for filing his taxes that JOSEPH contacted THIBODEAU. I would have recommended some form of damage control if this were the case, meaning, "let's find out what was not filed, get some pro forma returns and let's see where we are". In 2010 there were letters between THIBODEAU and the DOJ. THIBODEAU suggested that JOSEPH needed to file his taxes but THIBODEAU also wanted to see what the returns looked like. THIBODEAU told JOSEPH that he needed to file the tax returns and that they needed to make sure that they

were right.

THIBODEAU likely would have told JOSEPH to not contact the IRS and to not talk to them if they contacted him.  He did this will all his clients.  That was why people had attorneys.  THIBODEAU would have told JOSEPH "whatever you do don't file a false return.  What JOSEPH alleged in his 2255 motion was not even close to what THIBODEAU would have told him.

THIBODEAU agreed to provide copies of the engagement letter and other template documents to the office of the U.S. Attorney.